555 So.2d 511 (1989)
Brian J. GILMORE and Cody W. Baum
v.
Irma R. RUSSELL, State of Louisiana, Department of Transportation and Development and Old Hickory Casualty Insurance Company.
No. 89-CA-0427.
Court of Appeal of Louisiana, Fourth Circuit.
December 14, 1989.
Writs Denied February 23, 1990.
*512 Steven J. Koehler, Leefe, Donelon, Donelon & Koehler, Metairie, for appellee Old Hickory Cas. Ins. Co.
Philip A. Costa, New Orleans, for defendant/appellee Irma R. Russell.
William J. Guste, Jr., Atty. Gen., Arthur E. Stallworth, Asst. Atty. Gen., Louisiana Dept. of Justice Division of Risk Litigation, Baton Rouge, for defendant-appellee/appellant Dept. of Transp. and Development.
Ivan David Warner, III, Clyde A. Ramirez, Patricia D. Miskewicz, Byron P. Guillory, Ramirez, Warner & Miskewicz, New Orleans, for plaintiff/appellant Brian J. Gilmore.
Before LOBRANO, WARD and WILLIAMS, JJ.
LOBRANO, Judge.
On September 28, 1986 Irma Russell (Russell), a Mississippi River Bridge Authority Officer, collided with a truck owned and driven by Brian Gilmore (Gilmore). Cody Baum (Baum) was a passenger in Gilmore's truck. As a result of that collision, Gilmore and Baum sued the Louisiana Department of Transportation and Development *513 (DOTD), Officer Russell, and Gilmore's uninsured motorist carrier, Old Hickory Insurance Company, for the injuries they received. Russell reconvened for her damages asserting Gilmore was at fault in causing the accident.
The trial court found Russell liable and awarded Gilmore $15,000.00 in general damages, $4,137.00 for medical expenses, and $340.00 in lost wages. Baum was awarded $150,000.00 in general damages, $5,412.43 for medical expenses, $22,481.00 in lost wages and $100,000.00 for diminished earning capacity. Old Hickory was awarded $6,767.00 for its subrogation claim.
Gilmore appeals asserting that the court erred in finding that his physical condition at the time of the trial was not causally connected to the accident, and therefore his damage award is inadequate.
DODT appeals asserting that the court erred in finding its employee, Russell, at fault, and awarding excessive damages to Baum. The excessive damage claim is based on the following assertions.
1) The trial court incorrectly rejected Dr. Nutik's opinion;
2) Baum failed to mitigate damages by refusing surgery;
3) The trial court failed to offset Baum's lost wage award by the unemployment compensation he received;
4) Baum's lost wages and diminished earning capacity were not properly computed;
As a plaintiff in reconvention, Russell also appeals, asserting the trial court erred in not finding Gilmore to be the sole cause of the accident, or in the alternative, at least partially at fault. She seeks damages for her own injuries.
Baum and Old Hickory request that the trial court's judgment be affirmed.
The arguments raised by the various parties can be consolidated into the following dispositive issues:
1) Who was at fault in causing the collision?
2) Were Gilmore's damages adequate?
3) Were Baum's damages excessive?
FACTS:
The collision in question took place at the intersection of General Meyer Avenue, which runs in an east-west direction, and Woodland Place, which runs in a north-south direction, on the West Bank in New Orleans. The portion of General Meyer which lies to the west of Woodland is four lanes. East of its intersection with Woodland, it is a two lane street. That portion of Woodland north of General Meyer is a two lane road, which becomes four lanes after it crosses General Meyer. On the northwest corner of the intersection, there are some oak trees situated about 10-15 feet from the road, and tall shrubbery, situated about 30-40 feet from the road. A traffic light controls the intersection.
The collision occurred at approximately 12:00 noon on September 28, 1986. Russell was driving a marked Mississippi River Bridge Police Vehicle eastbound on General Meyer in response to a Code 2 emergency call. A Code 2 call requires a police officer to proceed as quickly as possible to the scene of the emergency, with siren sounding and emergency lights flashing, but at a safe rate of speed. The speed limit on General Meyer is 40 miles per hour. As she approached the intersection, the traffic light turned red. Russell proceeded through the intersection.
At the same time, Gilmore was driving his 1986 red Mazda truck southbound on Woodland. Baum was riding in the passenger seat. Neither Gilmore nor Baum were wearing a seat belt. As Gilmore approached the intersection, proceeding at a normal rate of speed, the light at General Meyer turned from red to green. A vehicle facing the opposite direction on Woodland and situated on the opposite side of General Meyer, made a left turn onto General Meyer. Gilmore slowed down to allow this car to pass in front of him, and as he crossed General Meyer, his attention was focused on a second vehicle also waiting to make a left turn. At this time, his vehicle was struck on the passenger side by Russell's vehicle. Russell's vehicle subsequently struck the vehicle which had been *514 waiting to make the left turn onto General Meyer.
The accident was witnessed by Tom and Nina Graham, who were in the left-turning vehicle struck by Russell; Andrea Ussin, who was waiting to turn left behind the Grahams' vehicle, and Donald Dardar, the Mississippi River Bridge Authority Police Officer who accompanied Russell.
LIABILITY
The trial court found that Officer Russell was the sole cause of the accident. DOTD and Russell argue that the trial court erred in finding Russell to be at fault and in failing to find Gilmore to be the sole cause of the collision, or alternatively, comparatively negligent. Gilmore and Baum argue that the trial court's holding in this respect should be affirmed.
At trial, Russell testified that she was responding to a Code 2 emergency call relative to a disturbance at the lower Algiers ferry landing. She turned on her emergency lights approximately eight blocks before the intersection of Woodland and General Meyer, but she did not sound her siren until she was within a block of the intersection. She was traveling at approximately 35 miles per hour as she approached the intersection. At that time, the light turned from green to yellow to red. She slowed down to about 25 miles per hour for the red light and looked to her left and right several times but did not come to a complete stop. Before she crossed the intersection, the first vehicle facing north on Woodland had already made a left turn onto General Meyer. The first time she saw Gilmore's truck in the intersection was as she was about to strike it on the passenger side.
Gilmore testified that he never came to a stop before he reached General Meyer because he was 100 feet away from the intersection when the light turned from red to green. As he proceeded through the intersection, he was focused on the car across from him about to make a left turn, and not in the direction of Russell's vehicle. He did not hear a siren or see a flashing light.
Tom Graham, the driver of the second left-turning vehicle, which was subsequently struck by Russell, testified that he saw the police lights and heard a minute siren. He absolutely did not hear a long sustained blast, and he did not see the police vehicle slow down until seconds before the impact. He concluded that neither vehicle saw each other because of trees and shrubs on the river side of Woodland which may have obscured the view of both drivers.
Nina Graham testified that there was not a continual siren, but instead, only one "blurp." The police vehicle was approximately 150 feet from the intersection when she heard the siren. She too testified that the trees and hedges on the corner could have obstructed the view of both the vehicles.
Andrea Ussin, who was driving the vehicle directly behind the Graham's vehicle, testified that the first time she heard the siren was approximately 30 feet before the police car hit the red truck. She did not see the police car slow down.
Donald Dardar, who accompanied Russell, testified that Russell first put on her siren at least 5 minutes before the accident happened. He testified that Russell kept changing the siren from a "whoop" noise to a "yelp" in order to better get other drivers' attentions. He also testified about the shrubbery and trees obstructing the view of Woodland, and that the first time he saw the Gilmore truck was at impact.
The Louisiana law on emergency vehicles, La.R.S. 32:24 states:
"A. The driver of an authorized emergency vehicle, when responding to an emergency call, or when in pursuit of an actual or suspected violator of the law, or when responding to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated.
B. The driver of an authorized emergency vehicle may:
(1) Park or stand, irrespective of the provisions of this Chapter;
(2) Proceed past a red or stop sign, but only after slowing down or *515 stopping as may be necessary for safe operation;

(3) Exceed the maximum speed limits so long as he does not endanger life or property;
(4) Disregard regulations governing the direction of movement or turning in specified directions.
C. The exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of audible and visual signals sufficient to warn motorists of their approach, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.
D. The foregoing provisions shall not relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others." (emphasis added).
While Russell may have been authorized to proceed through the red light, she could only do so "after slowing down or stopping as may be necessary for safe operation, ... making use of audible and visual signals sufficient to warn motorists of [her] approach," and even then she retained "the duty to drive with due regard for the safety of all persons."
The testimony indicates that Russell proceeded into the intersection driving at 35-40 miles per hour, without ever significantly reducing speed. While she did have her emergency lights turned on, she only sounded her siren once immediately before the collision. In addition, the presence of the shrubs and trees which partially obscured the view of the intersection only heightened her duty to sound her audible signal, as her visual signal would not alert vehicles on the north side of General Meyer of her presence.
La.R.S. 32:125 states:
"A. Upon the immediate approach of an authorized vehicle making use of audible and visual signals, or of a police vehicle properly and lawfully making use of an audible signal only, the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right hand edge or curb of the highway clear of any intersection, and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.
B. This Section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway." (Emphasis added)
In Cassity v. Williams, 373 So.2d 586, 591 (La.App. 3rd Cir.1979), the court held that "[T]he duty to yield the right of way to an emergency vehicle arises only when a motorist observes or hears, or under the circumstances should have observed or heard the audible and visual warnings of such vehicle." In the instant case, Gilmore was proceeding at a normal rate of speed through a green light, and was properly focusing on a vehicle about to make a left turn in his path. Because of the obstructions on his immediate right he would have no way of knowing that an emergency vehicle was approaching unless there was an audible signal. Because Gilmore had no duty to yield the right of way to the emergency vehicle until he was alerted to its presence, he was not at fault in the collision.
The court in Cassity stated:
"Although the driver of an emergency vehicle is authorized ... to exceed speed limits and to disregard regulations governing direction of traffic flow, ... such a driver is not relieved of the duty to drive with due regard for the safety of others. (citations omitted) A breach of this duty will result in a finding of actionable negligence on the part of the driver." Id. at 589-590.

While we are aware that some of the testimony concerning the audible alarms may be conflicting, the credibility of witnesses is a factual determination to be made by the trial court. Green v. Louisiana Coca Cola Bottling Co. Ltd., 477 *516 So.2d 904 (La.App. 4th Cir.1985), writ denied, 478 So.2d 910 (La.1985). We therefore cannot say that the trial court's determination of liability is manifestly erroneous.
BRIAN GILMORE'S DAMAGES
Gilmore asserts that the damages awarded him, $15,000.00 in general damages, $4,137.63 in medical expenses, and $340.00 in lost wages, are inadequate. He urges that this court re-evaluate the trial court's factual determinations regarding the causation of his condition, and the quantum awarded.
We have reviewed the medical evidence and conclude as follows. Immediately following the accident, Gilmore received emergency treatment at Jo Ellen Smith Hospital. He visited Dr. Horne once, then began physical therapy with Dr. Giambelluca, a family practitioner, for about 2½ months. Dr. Giambelluca diagnosed soft tissue injury and muscle strain in the cervical, dorsal, and lumborsacral areas. He provided conservative care for the neck, lower back, headache, shoulder and leg pain. When Gilmore did not respond, he was referred to Dr. Diaz, an orthopaedic surgeon.
Gilmore first visited Dr. Diaz on February 13, 1987. Dr. Diaz reported intermittent back and shoulder pain. A CT scan on February 21st of the lumbar spine revealed mild degenerative changes of the lumbar facet joints. While Dr. Diaz admitted that some of those changes could have been traumatically related, his conclusion was that Gilmore probably had those changes prior to the accident. The CT scan also revealed a slight disc bulge at the L4-5 level, but no evidence of active disc herniation in the lumbar spine. His examination was normal; negative straight leg raising; no spasm; no limitation in ranges of motion.
On March 20th, an EMG of the cervical spine was suggestive of nerve root irritation.
On April 14th, Gilmore still had the same complaints. A CT scan run at that time was normal, but Dr. Diaz thought Gilmore's neck condition should be evaluated by a neurosurgeon.
In May of 1987, Gilmore was attacked outside a bar and suffered a compound fracture of the elbow. Gilmore claims that his back pain did not increase or decrease as a result of the incident.
On June 6, 1987, he consulted Dr. Vogel for lower back pain and cervical pain. An MRI on June 24, 1987 revealed a herniation of the 4-5 disc. A CT scan with a disc injection on August 26th revealed a herniation, with the dye reproducing the pain. A percutaneous discectomy was performed which removed disc material through a suction probe under local anesthesia. Though improved, Gilmore is now disqualified from lifting 50 pounds or repetitive stooping, bending or squatting.
In determining the damages to be awarded, the trial court relied upon the testimony of Dr. Diaz, who concluded that as of February, 1987, based on the EMG, CT scan and his own clinical findings, Gilmore had no disc herniation. However, Dr. Diaz did feel that Gilmore required some further treatment when he last saw him on April 14, 1987. Dr. Vogel's x-ray and clinical findings of June, 1987, one month after the May, 1987 fight, revealed a definite herniation at the L4-5 level.
Appellate courts are bound by the following principle when reviewing the damages awarded by the finder of fact. "The trial court is given great discretion in awarding damages and will not be reversed absent clear error." Smith v. Louisiana Farm Bureau Mut. Ins. Co., 440 So.2d 801, 803 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1226 (La.1984).
We find that because of the contrast between the February, 1987 and June, 1987 medical findings, the trial court was reasonable in concluding that the May, 1987 fight was the intervening cause of the L4-5 herniation. Guided by the above cited legal principle, we must affirm the decision of the trial court with regard to Gilmore's damages.
CODY BAUM'S DAMAGES
DOTD argues that the damages awarded Baum by the trial court are excessive. (General damages of $150,000.00; medical *517 expenses of $5,412.43, lost wages of $22,481.00 and diminished earnings capacity of $100,000.00.) DOTD's argument is based on different assertions which we discuss separately.
1. DR. NUTIK'S OPINION
DOTD asserts that the trial court's award of general damages and medical expenses is an abuse of discretion. In his reasons for judgment, the trial judge synopsized the medical testimony as follows:
"After emergency care [Baum] was treated by Dr. Horne and then by Dr. Giambelluca through February 5, 1987 with little improvement. He saw Dr. Gessner, an orthopedic surgeon, on March 4, 1987 for lower back and chest pain. X-rays revealed a grade one spondylolisthesis in the lumbar spine. A CT scan was normal except for a slight bulge in the disc. Motion x-rays on May 6, 1987 revealed back instability and a corset was prescribed. The corset eased Baum's pain, and by July 7th he had worn the first corset out. On September 15th, he was still in pain with spasm. By December 29, 1987, he had developed numbness in the toes indicative of nerve root irritation. X-rays again showed lower back instability. An MRI in January, 1988 showed a bulging disc. By March 9, 1988 he had worn out the second corset. Dr. Gessner offered a surgical fusion which Baum has thus far refused. Whether his complaints are related to the spondylolisthesis or the bulging disc, or both, is probablematic, though Dr. Gessner seems to indict the instability. This much is clear. Before the accident and for a long time, Baum had performed heavy labor as a landscape gardener without pain. He has not done heavy labor since, and Dr. Gessner limits him to lifting 20 lbs."
DOTD argues that the trial court erred in rejecting the medical opinion of Dr. Gordon Nutik regarding the nature and extent of Baum's injuries. On March 25, 1988, Dr. Gordon Nutik examined Baum. It was his opinion that, at that time, Baum had a normal range of back motion, and no evidence of instability.
However, prior to and subsequent to that date, Baum was treated by Dr. Gessner, as is indicated supra. Dr. Gessner's diagnosis of acute lumbosacral sprain with a contusion to the interior chest along with a spasm of the muscular structure controlling the lumbar spine remained constant from March of 1987 to May of 1988.
This court in Sino v. Chalmette General Hospital, 489 So.2d 311, 313 (La.App. 4th Cir.1986), noted, "[s]ince a treating physician has the opportunity for repeated examinations, and sustained observation of the plaintiff, his testimony is given greater weight than that of a physician seen for litigation purposes." This principle satisfies us that there was no error by the trial court in relying on the testimony of Dr. Gessner in making its determination.
2. FAILURE TO MITIGATE DAMAGES BY REFUSING SURGERY
DOTD asserts that Baum's refusal to have the fusion surgery recommended by Dr. Gessner constitutes a failure to mitigate damages, and that his damages, specifically the award for diminished earning capacity, should be reduced accordingly. The law regarding mitigation of damages was set forth by the Louisiana Supreme Court in Pisciotta v. Allstate Ins. Co., 385 So.2d 1176 (La.1980). There, the plaintiff's physician recommended surgery to alleviate pain caused by a herniated disc. Medical evidence indicated that if she underwent the surgery, she could return to her normal occupation and activities. There was no indication that plaintiff was given any alternative treatment recommendations. The court reduced plaintiff's award for loss of earning capacity, stating, "A plaintiff must minimize his damages by submitting to reasonable corrective surgery necessary to eliminate any permanent disability." Id. at 1182.
In the instant case, Dr. Gessner gave Baum a choice as to whether to continue being treated on a conservative basis, or to have a fusion. Dr. Gessner's testimony on this issue is as follows:

*518 "Q. Have you noticed any improvement at all in Mr. Baum's conditions as far as the instability?
A. His symptoms seem to wax and wane, he will have exacerbation of pain and then have remission of pain, usually depending on his physical activity, and he has actually been given a choice on whether to continue being treated on a conservative basis, and he elects to continue with the conservative type treatment." (emphasis added)
Baum has not refused to undergo surgery, but instead, has chosen the alternative given to him by Dr. Gessner of continued conservative treatment. Furthermore, Dr. Gessner testified that even if an optimum result were achieved by the surgery, Baum's condition would not be eliminated. He would continue to suffer a 25% disability, and would be unable to return to his normal occupation of landscape gardening. The instant case can be factually distinguished from Pisciotta.
For the same reasons, we distinguish Neff v. Allvend, Inc., 474 So.2d 1027 (La. App. 5th Cir.1985), writ denied, 478 So.2d 148 (1985), relied on by DOTD. A reading of that case clearly suggests that future surgery would have relieved plaintiff's pain. His failure to undergo surgery resulted in a reduction of his general damage award.
We conclude that the evidence in the instant case does not support a finding that Baum's problems will be solved by future surgery. Further, in all probability, conservative treatment will produce the same results.
3. OFFSETTING OF WAGES BY UNEMPLOYMENT COMPENSATION
DOTD asserts that the trial court erred in failing to offset the amount of lost wages by the amount of unemployment compensation received by Baum and Gilmore. It is well settled jurisprudence in Louisiana that under the "collateral source" rule, an injured plaintiff's tort recovery is not diminished because of insurance benefits received by the plaintiff from sources independent of the tort-feasor's procuration or contribution. Weir v. Gasper, 459 So.2d 655 (La.App. 4th Cir.1984), writ denied, 462 So.2d 650 (1985). For the same reasons, we conclude that there is no error in not offsetting the amount of lost wages by the unemployment benefits collected by the plaintiffs.
4. COMPUTATION OF BAUM'S LOST WAGES AND DIMINISHED EARNING CAPACITY
The trial court awarded Baum $22,481.00 for loss of earnings between the date of the accident and the date of trial. In addition, he was awarded $100,000.00 for diminished earning capacity. DOTD urges that these damages are excessive, and should be reduced.
(a) Lost Wages
Evidence presented at trial reveals that Baum returned to his job at Louisiana Landscape Inc. one week after the September, 1986 accident. Randy Loup, Baum's employer, testified that Baum had previously worked as a foreman of a gardening/landscaping crew. His job required him to lift objects weighing 50 pounds or more on a regular basis, as well as bend and climb. His gross income was approximately $270.00 per week. However, Baum lost his job in December of 1987 when according to Loup, he was terminated because of his physical problems. Dr. Gessner's testimony confirms this physical disability. Baum had been tardy and absent on several occasions, and while Loup cited tardiness as the reason for termination, he admitted Baum had been absent and tardy due to doctor's appointments. The period of Baum's unemployment between December, 1987 and the date of trial (June 20, 1988), can be considered related to the September, 1986 accident.
The Louisiana Supreme Court, in Folse v. Fakouri, 371 So.2d 1120, 1122 (La.1979), in defining lost wages, stated: "Loss of past earnings are the monetary losses plaintiff experienced during the interval between the date of the accident ... and the time of the trial....". This court has held that "[a]wards for damages for loss wages up *519 to the date of trial can be calculated mathematically from the proof offered and do not fall within the `much discretion' rule." Cookmeyer v. Langston, 487 So.2d 525 (La. App. 4th Cir.1986) at 526.
In the instant case, Baum lost seven month's earnings from December, 1987 through June, 1988, the date of trial, plus one week immediately after the accident, or a total of twenty nine weeks. Considering his earnings at $270.00 per week, his lost wages are computed to be $7,830.00. We therefore reduce the trial court's award to that amount.
(b) Diminished Earning Capacity
The trial court also awarded Baum $100,000.00 for diminished earning capacity. The court in Folse, supra, also set forth guidelines for determining diminished earning capacity, stating:
"Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily." Id. at 1124.
In Folse, the court reviewed the many factors considered by the jury in making its determination as to diminished earning capacity, including plaintiff's age, training, occupation, the average salary of a person of that occupation, inflation, employment opportunities, and the fact that he was vigorous prior to the accident. Clearly, this type award is subject to the "much discretion" rule.
Applying those same factors to the instant case, we note that Baum was 23 years old at the time of the accident, and was in good physical health. While x-rays did indicate the presence of grade one spondylolisthesis in the lumbar spine (the slipping of one vertebrae on another which is a congenital defect), Baum had performed heavy physical labor as a landscape gardener for some time prior to the accident, and had never experienced pain. He has a high school education and one year of college, but was only experienced as a physical laborer, primarily in the area of landscape gardening. In his present condition, he is unable to perform this type of labor, and is limited to lifting 20 lbs. The trial court's award of $100,000.00 for diminished earning capacity was based on the hope that Baum can retrain himself to do light work. Although we admit this amount is on the high side of a permissible range, we cannot say it is so great as to constitute a clear or manifest abuse of the trial court's discretion.
For the foregoing reasons, we reduce the trial court award for loss wages to $7,830.00. In all other respects, the judgment is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.