620 So.2d 897 (1993)
Adolph W. FINNIE, Jr.
v.
Donald D. VALLEE and State Farm Mutual Automobile Insurance Co.
No. 92-CA-2122.
Court of Appeal of Louisiana, Fourth Circuit.
May 27, 1993.
Amending Opinion on Rehearing July 20, 1993.
*898 Walter A. Robelot, II, Michael A. Fenasci, Fenasci, Smith & Robelot, New Orleans, for plaintiff/appellant.
David P. Salley, James Ryan, III, Sessions & Fishman, New Orleans, for defendant/appellee.
Before ARMSTRONG, JONES and WALTZER, JJ.
WALTZER, Judge.
In this case, plaintiff, Adolph Finnie, Jr., appeals the trial court's granting of a Judgment Notwithstanding the Verdict (JNOV), which reduced the jury's award for past *899 and future earning capacity from $193,000.00 to $20,000.00.
On October 26, 1989, Mr. Finnie sustained injuries resulting from an automobile accident at the intersection of Camp Street and Toledano. The defendant, Donald Vallee, failed to adhere to the stop sign controlling his direction of traffic. The plaintiff suffered injuries consisting of a bulging disc at the L4-5 level and a herniated disc at the L5-S1 level. As a result, the plaintiff was diagnosed to have suffered a 30% permanent partial whole body disability. In November of 1991, the plaintiff underwent lumbar surgery to correct the herniated disc condition. After recuperating from the surgery, the plaintiff was diagnosed to have a 15% permanent partial whole body disability. Additionally, the plaintiff's physicians instructed him to limit his activities so as to avoid bending, stooping, repetitive picking up objects from floors, and pushing, pulling or lifting objects over fifty pounds.
Plaintiff initiated suit against defendants, Donald Vallee and his insurer, State Farm Insurance Company. Defendants entered a general denial; and, asserting the comparative negligence of the plaintiff, filed a third party demand against the plaintiff's insurer, Automotive Casualty Insurance Company, for damages to Mr. Vallee's car. Additionally, defendants filed a third party demand against the City of New Orleans, claiming that the City was at fault for not properly maintaining the intersection to prevent obstructions of the stop sign.
The case was tried before a jury beginning on March 16, 1992. On March 18, 1992, the jury returned a verdict, finding defendant Vallee 100% at fault for the accident, and awarding damages totaling $263,000.00. That award consisted of the following: $193,000.00 for past and future lost wages and earning capacity, $20,000.00 for past and future medical expenses and $50,000.00 for pain and suffering.
Defendants filed a motion for a JNOV, which the trial court granted on May 28, 1992. In his JNOV, the trial judge reduced the jury's award for past and future earning capacity from $193,000.00 to $20,000.00 and increased the award for pain and suffering from $50,000.00 to $125,000.00. The plaintiff now appeals the part of the JNOV which set aside and reduced the jury's award for past and future earning capacity.
Neither party appeals that part of the JNOV increasing the jury award for pain and suffering to $125,000.00. That part of the JNOV is thus not before us and considered final, and the plaintiff is awarded $125,000.00 for pain and suffering. We now turn our attention to the only issue raised on appeal, the trial judge's setting aside and reducing of the jury's award for past and future earning capacity.
The procedures for granting a JNOV are set forth in La.C.C.P. article 1811. That article, however, does not provide the standard a trial judge should use in issuing a JNOV. This standard has been judicially created, and, as stated by our Supreme Court, is as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott, supra. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, *900 i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict could be reinstated.
Anderson v. New Orleans Public Service Inc., 583 So.2d 829, 832 (La.1991); See also Doe v. Roman Catholic Church, 602 So.2d 129 (La.App. 4th Cir.1992), writ granted, 606 So.2d 524 (La.1992), on remand, 615 So.2d 410 (La.App. 4th Cir. 1993).
The trial judge, in granting a JNOV, may not simply substitute the jury's findings of fact and credibility determinations with his own. He must find as a matter of law that no reasonable trier of fact could have found as the jury did. Whether the trial judge is satisfied with the verdict, whether he would have ruled the same way, is of no consequence. If the jury verdict is supported by competent evidence and not wholly unreasonable, the trial judge is without authority to set the verdict aside.
In reviewing a JNOV, this Court must first determine whether the trial court was correct in setting aside the jury verdict by applying the above stated standard. If this Court finds, after a review of the record, that reasonable minds could conclude as the jury did, the JNOV must be set aside and the jury verdict reinstated. However, if we find that the trial judge was correct in setting aside the jury verdict, we must then review the JNOV as if it were the only judgment from the trial court. Anderson, supra at 834; see also Rickerson v. Fireman's Fund Insurance Company, 543 So.2d 519 (La.App. 1st Cir. 1989). We now turn to our first inquiry of whether the trial court was correct in setting aside the jury's award of $193,000.00 for past and future lost wages and earning capacity.

LOST WAGES AND EARNING CAPACITY
Louisiana law has long recognized and allowed compensation of past and future earning capacity. In Folse v. Fakouri, 371 So.2d 1120 (La.1979), our Supreme Court discussed at length this type of damage.
Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. Folse, supra at 1124.
Every circuit in this state has since allowed such damages and have elaborated on the means of measuring this type of loss. Simmons v. City of Monroe, 588 So.2d 1357 (La.App.2d Cir.1991), writ den., 591 So.2d 708 (La.1992); Mitchell v. Clark Equipment Company, 561 So.2d 175 (La. App. 5th Cir.1990); Gilmore v. Russell, 555 So.2d 511 (La.App. 4th Cir.1989), writ den., 559 So.2d 140, 142 (La.1990).
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344, 346 (La.1990).[1] The trial court should *901 consider whether and how much the plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what the plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition.
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident. Sherlock v. Berry, 487 So.2d 555, 558 (La.App. 4th Cir.1986). While the plaintiff at all time has the burden of persuasion by the preponderance of the evidence regarding his earning capacity before and after the accident, proof need only be that which would reasonably establish the claim. Expert testimony of an economist might best prove this type of loss. However, the plaintiff's own testimony, if credible and truthful, may suffice in proving his claim. Sherlock v. Berry, supra at 558.
In this case, both the plaintiff and an economist, Dr. Wolfson, testified as to plaintiff's earning capacity prior to and after the accident. The plaintiff testified that for a number of years, up until 1985, he owned and operated a small grocery store, which earned him somewhere between thirty to thirty-five thousand (30,000-35,000) dollars a year. In 1985, the plaintiff was forced to sell his business due to a federal indictment for food stamp fraud. Defendants argue that the plaintiff introduced no tax returns or any physical evidence to prove his earnings while in the grocery business. However, our review of the record indicates that the defendants introduced no evidence to refute the plaintiff's allegations. While the plaintiff may have better proved his previous earnings by supporting his testimony with physical evidence, his testimony alone, if credible and true, is competent evidence and may be relied on by the jury in making its determination.
The plaintiff further testified that he did not work, of his own choice, for some time after 1985. While the plaintiff stated that he did a variety of jobs prior to the accident, the only one he actually named was his work for Waterman Steamship Company. The plaintiff testified that a friend of his enabled him to do some part time work as a member of a shore gang loading food and supplies onto ships, as well as other tasks. He stated that he worked for a few months with Waterman, ending just two or three months before the accident. A pay stub was introduced as evidence to support plaintiff's testimony that he was earning twelve dollars and eight cents ($12.08) per hour, with time and a half on weekends and holidays. Plaintiff testified that he had always lived near the docks, was familiar with this type of work, and was planning on joining a union so that he may work with Waterman on a steady and regular basis. Dr. Wolfson testified that had plaintiff been able to join the union and work regularly with Waterman, his projected salary would have been twenty-five thousand ($25,000.00) a year.
The plaintiff, after the accident, took a part time position with Coastal Electronics Inc., shipping car alarms and stereos. The plaintiff worked four hours a day, four to five days a week, earning about six dollars ($6.00) per hour. However, he was forced to leave this job due to the amount of physical work he was required to perform. He then obtained a position at the Conveyor of Mortgages for Orleans Parish as a supervisor of records. There he currently works four hours a day, five days a week, earning a salary of almost $12,000 a year.
*902 Dr. Wolfson was presented as an expert witness in forensic economics to testify about plaintiff's lost earning capacity. This expert witness made several calculations based upon two different inflation discount rates. Using a table issued by the federal government, and taking into account the plaintiff's age of 51 at the time of trial, Dr. Wolfson testified that his calculations were based on the assumption that the plaintiff had eleven years of work life remaining. The first calculation figured the difference of a steady job with Waterman at $25,000 per year minus the $12,000 plaintiff was earning at the time of trial. The difference, thirteen thousand, was then multiplied by the eleven years of work life remaining, and then discounted at two different rates. The first rate used was 7.5%, which the witness stated he believed to be an average figure given the fluctuating rates from the years before. With this discount rate, the witness testified that the plaintiff's lost future earning capacity totalled one hundred and seventeen thousand four hundred and eight dollars ($117,408.00). The witness was then asked to calculate the same difference in earning capacity using a 3.5% discount rate, which the witness stated was the interest rate at the current time. The witness' calculation, at this lower rate, was one hundred and forty-seven thousand dollars ($147,000).
The witness was then asked to determine the difference between the plaintiff's current salary and his salary of $35,000.00 per year that he was allegedly earning when he was working in the grocery business. Using the same eleven years of work life remaining, and the 7.5% discount rate, the witness stated that the plaintiff's lost earnings would be two hundred and seven thousand seven hundred and twenty-three dollars ($207,723.00). The witness then calculated the same difference using the 3.5% discount rate and arrived at two hundred and sixty thousand dollars ($260,000.00).
To these figures, Dr. Wolfson added his calculations for lost past earning capacity using the same $25,000 per year and $35,000 per anum figures as the plaintiff's potential earnings. Calculating the plaintiff's lost earning capacity from the date of the accident up to the time of the trial, Dr. Wolfson estimated that the plaintiff lost either forty thousand and forty-one dollars ($40,041.00), using the assumed potential earning of $25,000 per year, or sixty-two thousand two hundred and fifty dollars ($62,250.00), using $35,000 as potential earnings. Additionally, to add to his past lost earnings, the plaintiff introduced evidence that he lost several weeks of work at Coastal for the lumbar surgery and other related medical problems.
During his direct examination of Dr. Wolfson, and during his closing argument, counsel for the plaintiff commented that the plaintiff would have probably, as many people do, worked past the age of 62. Plaintiff's attorney thus suggested to the trial court that the economist's use of eleven years for the plaintiff's remaining work life was a conservative estimate.
During cross-examination, Dr. Wolfson admitted that he never saw a tax return or a financial statement to support plaintiff's allegation that he was earning between $30,000 and $35,000 each year while operating his grocery business. Also relied on by Dr. Wolfson were the plaintiff's ability and likelihood of being able to join the union and receive steady work as a member of a shore gang with Waterman.
Defendants attempted to show how difficult it is to join a union and work for a steamship company on a regular basis. They introduced the testimony of Mr. Raymond Cuccia, Chief Boatman of Waterman Steamship Company. He testified that he was and is in charge of hiring the workers who load the ships, as well as other duties. He was the person who hired the plaintiff for the few weeks he worked for Waterman before the accident. Mr. Cuccia stated that the plaintiff worked for Waterman for one job only, lasting about twelve to fifteen days. He also testified that the plaintiff was not a member of the union, that only union members were supposed to be hired for such jobs, and that he lost his hiring privileges for over a year for hiring the plaintiff and other non-union members. He further stated that he would not be able *903 to hire the plaintiff because the plaintiff was not a member of the union.
Mr. Cuccia then went on to describe the requirements of becoming a member of the union from which he hires. First, one must get seaman papers from the Coast Guard, indicating that he is a seaman. Then the person must get a letter of recommendation from another steamship company. Then he would need to get a passport, then pay union fees, and take a physical. Upon joining the union, the person would still not be guaranteed work, as all jobs are handed out by seniority. Mr. Cuccia estimated that it would take about eight years before a person would be guaranteed of working regularly, making a salary of $25,000.00 a year.
The jury awarded $193,000.00 for past and future lost wages and earning capacity. In arriving at this figure, we believe the jury concluded that the plaintiff, but for the injuries related to the accident, could have earned somewhere between $25,000.00 to $30,000.00, using either one or an average of the discount rates.
While the defendants presented strong evidence suggesting that the plaintiff would not have been able to immediately begin working for Waterman, they never completely refuted the possibility that the plaintiff was physically and otherwise qualified to go through the necessary procedures for becoming a member of the union. No one refuted the fact that the plaintiff worked for Waterman for at least several weeks and was able to do the job. The plaintiff testified that he was very interested and intent on joining the union and working full time for Waterman. We therefore find that the plaintiff's testimony and his prior work experience sufficiently prove his claim that he could have worked for Waterman or a similar company as a member of a shore gang.
Furthermore, while plaintiff did not introduce any tax returns or like evidence to support his contention that he was earning between $30,000.00 to $35,000.00 a year while operating the grocery store, his testimony alone, although not incredibly strong, is sufficient to support this allegation. "Proof need only be that which would reasonably establish the claim; it may even consist of the plaintiff's own testimony if accepted as truthful." Sherlock v. Berry, 487 So.2d 555, 558 (La.App. 4th Cir.1986), writ not considered, 489 So.2d 912 (La. 1986) [citing Mushatt v. Barouise, 474 So.2d 511 (La.App. 4th Cir.1985)]. Unrefuted by the defense, was the fact that plaintiff was in fairly good physical condition, without any previous disabilities, prior to the accident. In addition to considering the potential job with Waterman and the plaintiff's previous earnings from his grocery business, the jury was free to consider the fact that the plaintiff currently works only four hours a day, five days a week, and that he might have been able to work regular hours or longer, as he indicated he used to do for his grocery business. We thus find several different considerations, all of them reasonable, from which the jury could have returned the award of $193,000.00.
After our own review of the record, we find that the jury was not unreasonable and that reasonable minds could differ that the plaintiff lost an earning capacity of somewhere between $13,000.00 to $18,000.00 a year for a remaining work life of eleven or more years. The trial judge's setting aside of the jury's award of $193,000.00 for past and future lost wages and earning capacity was in error, and this award is therefore reinstated.
For the foregoing reasons, the JNOV setting aside the jury's award for past and future lost wages and earning capacity is reversed, and the jury's verdict awarding $193,000.00 is hereby reinstated.
REVERSED AND RENDERED.
ARMSTRONG, J., concurs.

IN RE: REHEARING APPLICATION

DIRECTED TO: HONORABLE RICHARD J. GARVEY, JUDGE, CIVIL DISTRICT COURT, FOR THE PARISH OF ORLEANS, DIVISION "C", C.D.C.#90-17608
*904 PER CURIAM.
The judgment previously rendered on May 27, 1993 is amended to award to appellant all costs incurred in the trial court, as well as on appeal.
NOTES
[1] We note that in Hobgood and other cases, Courts have affirmed awards for lost earning capacity when the plaintiff was either not working or in a particular profession at the time of the accident or was earning more after the accident. Hobgood, supra at 346; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Landry v. Melancon, 558 So.2d 1143 (La.App. 1st Cir. 1989). These cases further illustrate that earning capacity is not based upon actual earnings, but rather on the plaintiff's earning potential.