655 So.2d 659 (1995)
Earl PITRE, Jr., et al., Plaintiffs-Appellants,
v.
LOUISIANA TECH UNIVERSITY, et al., Defendants-Appellees.
No. 26388-CA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1995.
*663 Gregory P. Massey, Lake Charles, for appellants.
Barham & Arceneaux by Mack E. Barham, New Orleans, Hudson, Potts & Bernstein by W. Craig Henry, Monroe, for appellees.
Before MARVIN, HIGHTOWER, BROWN, WILLIAMS and STEWART, JJ.
BROWN, Judge.
During an unusual winter storm in 1988, Earl Garland Pitre, Jr., a 20-year-old resident student at Louisiana Tech University, joined a number of other students in sledding down a hill at the school's Assembly Center. Tragically, Pitre's sport ended when he struck a light pole in the parking lot at the bottom of the hill. He is now a paraplegic.
The trial court dismissed Pitre's lawsuit against Tech on a summary judgment motion. Because the danger was obvious, the trial court ruled that Tech owed no duty to warn or protect students engaged in this voluntary activity. On appeal this court concluded that a duty existed due to Tech's ownership or custody of the land and its special relationship to its students. The case was reversed and remanded for trial on the merits to determine outstanding issues of breach, causation, comparative fault and damages. Pitre v. Louisiana Tech University, 596 So.2d 1324 (La.App. 2d Cir.1991), writ denied, 604 So.2d 998 (La.1992).
On remand and after trial, Pitre's claims were rejected as the trial court again found that Tech owed no duty to Pitre. On the duty issue, however, the facts at trial were substantially identical to those presented in the summary judgment motion. Thus, we reverse and render judgment for plaintiffs, allocating fault and assessing damages.

LAW OF THE CASE
The initial issue presented relates to the effect of the decision rendered by this court in the first appeal. Was it the "law of the case" and determinative of the duty question? The term "law of the case" denotes a *664 principle that recognizes the binding force of trial court rulings during later stages of the trial, the conclusive effects of appellate decisions at the trial on remand, and that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case. Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 256 So.2d 105 (1971); Petition of Sewerage & Water Board of New Orleans, 278 So.2d 81 (La.1973) (emphasis added). The law of the case doctrine avoids indefinite relitigation of the same issue, obtains consistent results in the same case, affords one opportunity for argument and decision and provides fairness to the parties involved. Coldwell Banker v. City Bank & Trust, 25684 (La.App. 2d Cir. 03/30/94), 634 So.2d 959; Clomon v. Monroe City School Board, 557 So.2d 1100 (La.App. 2d Cir.1990), affirmed, 572 So.2d 571 (La. 1990).
The law of the case doctrine has been conditioned to apply only where the facts and issues on the subsequent remand or appeal are substantially the same as those involved in the prior appeal. Changes in the evidence that do not substantially affect the questions involved or the presentation of evidence that is cumulative will not defeat applicability of the law of the case doctrine. 5 Am.Jur.2d Appeal and Error § 746 (supp. 1994) (emphasis added).
The historical background for this court's first appellate decision on the duty question is fully set out in that opinion. Pitre, supra. Primarily the same evidence was introduced at the trial on the merits. The additional evidence presented addressed principally the issues of causation and damages. By way of introduction, the relevant factual background is set forth below.

FACTS
An ice and snow storm moved through northeast Louisiana in early January 1988. Prior to the storm, the Louisiana Tech Housing Office issued a winter bulletin to all dormitory residents. The bulletin, entitled "Winter Storms and Louisiana Tech", was placed on the beds of each dorm resident by a staff member. The following is excerpted from the bulletin:
We encourage snowmen, sledding, etc., in proper areas and using good judgment. We discourage sledding down the hills along Tech Drive into the path of oncoming carsnot good judgement [sic]nor is being dragged behind a moving vehicle considered good judgement [sic]. Fifteen reported personal injuries were associated with such behavior during the last snow.
Earl Pitre, Jr., was a sophomore at Louisiana Tech in January 1988. Earl, who lived in a dormitory on campus, attended a Lady Techsters basketball game the evening of January 7, 1988. Classes had been canceled that day as a result of the ice storm and many students, confined to the campus by the weather, took the opportunity to enjoy the snow. After the game, Earl met with some friends who were going sledding off the hill between the Thomas Assembly Center and the Joe Aillet Football Stadium. The hill, which was approximately 85 feet high, led to a large, open parking lot, which was illuminated by several large light posts spaced approximately 150 feet apart. On the other side of the parking lot was the football stadium.
The students at the Assembly Center used makeshift sleds, such as cardboard boxes, plastic advertising signs and serving trays. Also utilized by the sledders were part of a rocking chair and a toilet seat. The most popular sled was a large, round, plastic trash can lid, approximately five feet in diameter. Because the lid was faster, traveled further and would hold several people on one ride, students waited in line for its use. After several trips down the hill on a cardboard sled, Earl joined the line of students who were using the lid. While riding on the lid, Earl and three other students struck one of the concrete-based lights in the parking lot. Earl received head and back injuries in the accident and is paralyzed from mid-chest down.
Earl and his parents filed suit against Louisiana Tech and the Board of Trustees for State Colleges and Universities, alleging that the university was negligent in failing to prohibit sledding around the Thomas Assembly *665 Center and in failing to warn of the hazards of sledding in that area. Plaintiffs also alleged that Louisiana Tech was negligent in encouraging sledding in areas known to be hazardous and in failing to place cushions around the bases of the light posts in the parking lot.
Plaintiffs and defendants filed motions for summary judgment. The trial court found that there were no disputed issues of material fact and that the issue was whether plaintiffs or defendants were entitled to judgment as a matter of law. The trial court denied plaintiffs' motion for summary judgment, granted defendants' motion and dismissed plaintiffs' demands.
Plaintiffs appealed. This court concluded that the trial court erred in finding that no duty existed, reversed and remanded for trial. Pitre, supra.
Trial was held in March 1993. The trial court once again found that defendants did not have a duty to implement, disseminate or enforce a no-sledding policy on campus. Judgment in defendants' favor was rendered and plaintiffs' demands were dismissed on January 14, 1994. It is from this judgment that plaintiffs appeal, arguing that the trial court erred in revisiting the duty issue and in failing to find that their injuries were caused by defendants' negligence.

APPLICABLE LEGAL PRINCIPLES
LSA-C.C. Art. 2315 provides in part that every act of man that causes damage to another obliges him by whose fault it happened to repair it. If this act involves the failure to exercise reasonable care, it is deemed negligence. Meany v. Meany, 94-0251 (La. 07/05/94), 639 So.2d 229.
In order to prevail in a negligence action, a plaintiff must prove:
(1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element);
(2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element);
(3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause in fact element);
(4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and
(5) actual damages (the damages element).
Mathieu v. Imperial Toy Corporation, 94-0952 (La. 11/30/94), 646 So.2d 318; Roberts v. Benoit, 605 So.2d 1032 (La.1991); Fowler v. Roberts, 556 So.2d 1 (La.1989); Thomas C. Galligan, Jr., A Primer on the Patterns of Negligence, 53 La.L.Rev. 1509 (1993).

Duty
Duty is defined as the obligation to conform to the standard of conduct associated with a reasonable man in like circumstances. Fox v. Louisiana State University Board of Supervisors, 576 So.2d 978 (La. 1991). The question of whether a duty exists in a particular set of circumstances is a question of law for the court to decide. Mathieu, supra; Berry v. Department of Health and Human Resources, 93-2748 (La. 05/23/94), 637 So.2d 412; Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984).
The duty issue was first presented to this court two years ago when plaintiffs appealed from the trial court's judgment granting defendants' motion for summary judgment, which was based on the erroneous legal conclusion that no duty was owed by defendants. We reversed and remanded the matter for trial. The following is excerpted from this court's opinion on rehearing:
The [winter storms] bulletin established Tech's knowledge of the general risk of injuries related to sledding, stating that:
... Fifteen reported personal injuries were associated with such behavior (sledding) during the last snow.
On the other hand, Tech's Security Police prohibited sledding anywhere on-campus. The Security Police believed that sledding off the hill at the Thomas Assembly Center was hazardous because of the specific danger of striking a light pole in the parking lot. The policy of the Security Police was to order students to stop whenever an officer observed this activity.

*666 The trial court determined that Tech owed no duty to protect plaintiff from his voluntary actions because the danger presented by the light pole was obvious. On rehearing we find this analysis and conclusion legally unsound.
A landowner or custodian owes a duty to a plaintiff to discover any unreasonably dangerous condition or use of its premises and to either correct the condition or warn of its existence. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991).
In addition to this general duty of a landowner or custodian, Tech had a duty arising out of its relationship with plaintiff as a resident student. Universities guide many aspects of student life by undertaking to provide food, housing, security and a wide range of extracurricular activities. In attempting to regulate the conduct of its students, Tech was obligated to take some reasonable and necessary steps to protect these students from foreseeable harm....
Arising out of its ownership or custody of the land and because of its relationship with plaintiff, Tech had a duty to protect or warn against this unreasonably dangerous activity. The trial court erred in determining by summary judgment that Tech owed no duty to protect plaintiff against this risk of harm.
Pitre, 596 So.2d at 1332-33 (emphasis added).
On remand, however, the trial court once again concluded that defendants owed no duty to Earl. According to the trial court, the existence of the winter storms bulletin did not affirmatively create a duty to provide or maintain a safe environment for sledding activities. The trial court also found that defendants did not have a duty to implement, disseminate and enforce a "no sledding" policy on campus. The trial court committed legal error in revisiting the duty issue on remand.
The evidence introduced at trial consisted overwhelmingly of the evidence that was before the trial court in the form of depositions on the motions for summary judgment. The additional testimony elicited and depositions introduced at the trial of this matter primarily addressed the issues of causation and damages. As noted above, whether a duty is owed is a legal determination. This court's conclusion that a duty was owed by defendants is the law of the case. In light of our previous holding in this case, we conclude that the duty issue was not properly before the trial court on remand and will not be considered again by this court on appeal. That issue became final when the supreme court denied writs and the matter was remanded to the trial court. See Shell Oil Company v. Texas Gas Transmission Corp., 210 So.2d 554 (La.App.1968), writs refused, 252 La. 847, 850, 214 So.2d 165, 166 (1968).

Breach
Through Tech's University Police, defendants were aware that students were sledding off the hill at the Thomas Assembly Center. Additionally, defendants were aware of the danger presented by the light poles in the parking lot at the foot of the hill. Therefore, they had a duty to either correct the unreasonably dangerous condition presented by the light poles or to warn of its existence.
The test for determining whether a breach of a landowner's duty to protect or warn against an unreasonably dangerous condition is whether, in the management of his property, he has acted as a reasonable man in view of the probability of injury to others. Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La.1976); Ladner v. Firemen's Insurance Co. of Newark, 519 So.2d 1198 (La.App. 2d Cir.1988).
Generally, a party who owes a duty breaches that duty when he fails to exercise reasonable care in protecting those at risk. Dobson v. Louisiana. Power & Light Co., 567 So.2d 569 (La.1990). Factors considered in the "reasonable man" analysis include the likelihood and gravity of the harm, the burden of prevention and the social utility of defendant's conduct. Meany, supra, citing William E. Crowe, The Anatomy of a Tort, 22 Loy.L.Rev. 903 (La.1976).
Depositions of University Police officers were introduced into evidence. Several officers stated that all sledding on campus was prohibited by the University Police Department, *667 especially in the areas along Tech Drive and at the Assembly Center. According to Sergeants David Sears and Bobbie Merritt and Patrol Officer Lori Scarborough, students sliding down the hill at the Assembly Center were to be stopped because of the trees at the bottom of the hill, light poles in the parking lot and concrete posts at the stadium. Sgt. Sears noted, "we felt that it was dangerous and once you started down the hill you had no control over whatever you were on and it could be a danger to the person that was sliding so." (emphasis added).
Testimony also establishes that the shift supervisor on duty at the time of the accident, Sergeant John Bennett, specifically told the officers on duty to keep people off the hill at the Assembly Center. As noted by Sgt. Bennett, "... a young person does not see danger like a grown-up does around here and one of our duties is to try to stop them before they start.... [W]e call ourselves high-priced babysitters sometimes. Some of these kids have never been away from home. And if you give them an inch they'll take a milesome of them." (emphasis added).
Through its University Police, Tech knew of the specific danger presented to sledders by the obstacles at the bottom of the hill at the Assembly Center. On the other hand, the Housing Department issued a winter storms bulletin that encouraged sledding on campus except in the areas along Tech Drive. The winter storms bulletin also notes that fifteen reported personal injuries were associated with sledding during the last snow. (emphasis added).
At the time of the accident, both the University Police and the Housing Departments answered to the Dean of Student Life. Although representatives of both departments attended monthly meetings with the Dean, there was no discussion about the conflicting policies regarding sledding, nor coordination of their respective actions regarding implementation of such policies.
Dr. Dan Corbin, plaintiffs' expert in recreational safety, and Steven Bunting, plaintiffs' expert in public safety administration, testified about numerous, inexpensive measures that could have been implemented to warn students against the danger associated with sledding at the Assembly Center. Effective warning alternatives included signs, announcements, radio advertisements, brochures and barricades. According to Dr. Corbin, who visited Tech's campus, the hill at the Assembly Center, because of its elevation, was the most desirable location for sledding. Dr. Corbin testified that this hill could have been made safe for sledding by placing bales of straw or wrapping gym mats around the light poles in the parking lot. Additional methods included the spreading of salt and sand at the bottom of the hill to slow the sledders' momentum and the placement of channeling devices or markers to limit the area where students could sled.
Defendants knew that the hill at the Assembly Center was utilized by sledders. They knew that the last snow resulted in fifteen personal injuries associated with student play in the snow and icy conditions. Furthermore, the danger presented by the light poles in the parking lot at the Assembly Center was such that serious injury was likely to occur should a sledder strike one of the posts. As noted above, the burden of prevention was minimal to the university; there were several inexpensive measures that could have been implemented to either warn students of the danger presented or to make the hill safe. The only positive action taken by the university was to place a bulletin on each dorm student's bed encouraging sledding. Defendants breached the duty owed to Earl by failing to correct or warn of the danger presented by the light poles at the bottom of the Assembly Center hill.

Cause in Fact
Cause in fact is a "but for" inquiry; if the plaintiff would not have sustained the injuries but for the defendant's substandard conduct, then such conduct is a cause in fact of the plaintiff's harm. Roberts, supra; Fowler, supra.
When multiple causes are present, an alternative method for determining cause in fact is the "substantial factor" test. Fowler, supra. Under this test, if the defendant's conduct was a "substantial factor" in *668 bringing about the plaintiff's harm, cause in fact is established. Roberts, supra; Dixie Drive It Yourself System New Orleans Co., Inc. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Weaver v. Valley Electric Membership Corp., 615 So.2d 1375 (La.App. 2d Cir.1993).
Based on its erroneous conclusion that no duty was owed, the trial court did not determine whether defendants' conduct was a cause in fact of the accident and plaintiffs' resulting injuries.
This determination is not simply whether the winter storms bulletin was the impetus that caused Earl to sled down the hill at the Assembly Center. The proper inquiry is whether or not defendants' failure to warn or correct the unreasonably dangerous condition presented by the light poles in the parking lot was a cause in fact of plaintiffs' injuries. Under the facts and circumstances of this case, we find that both defendants' and Earl's own conduct contributed to the accident and plaintiffs' resulting injuries.
Defendants' conduct was a substantial factor because in spite of its knowledge of the danger, it encouraged the activity and failed to warn or protect against the unreasonably dangerous condition created by the light poles. This failure to warn or protect was a substantial factor in bringing about the accident and resulting injuries.
Earl's conduct in sledding down an icy hill into a parking lot dotted intermittently with light poles, on an over-sized garbage can lid, headfirst, lying on his back, with three other students, was also a substantial factor in causing his and his parents' injuries.

Scope of Liability or Scope of Protection
The fourth inquiry, whether defendants' conduct was a legal cause of plaintiffs' injuries, entails a determination of whether their injuries were within the contemplation of the duty set forth above. There is no rule for determining the scope of the duty; the inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Roberts, supra; Dixie Drive It Yourself System, supra; Edwards v. State of Louisiana, 556 So.2d 644 (La.App. 2d Cir.1990). In determining legal cause, the ease of association test asks how easily the risk of harm can be associated with the duty that was breached. Roberts, supra; Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
We have found that one cause in fact of the accident was defendants' breach of duty by failing to warn or correct the unreasonably dangerous condition presented by the light poles in the parking lot at the bottom of a hill utilized by students for sledding. It is evident that the primary purpose for imposing such a duty is the protection of students from injuries incurred as a result of sliding into the light poles or other objects at the bottom of the hill, such as parked or moving vehicles, trash cans or other obstacles. The risk that a student might harm himself in such a fashion was therefore clearly within the scope of protection contemplated by imposition of that duty.

Comparative Fault
Based on our finding that both parties were at fault in causing the accident and resulting injuries, we must now compare the fault of the parties, allocate the respective percentages of fault and assess damages. C.C. Art. 2323; Rich v. Tench Electric Motor Works, Inc., 26,072 (La.App. 2d Cir. 08/19/94), 642 So.2d 293; Weaver, supra.
In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), the supreme court set forth the following factors to be considered in allocating fault:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger;
(2) how great a risk was created by the conduct;
(3) the significance of what was sought by the conduct;
(4) the capacities of the actor, whether superior or inferior; and
(5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Applying these factors, we find that defendants were aware of the danger presented by the light poles in the parking lot and that the *669 discretionary, sporadic, "one on one" warnings by University Police officers to students were ineffective means of protecting or warning against this dangerous condition. The magnitude and severity of Earl's injuries reflect the enormous risk created by defendants' failure to warn or protect.
Through the winter storms bulletin, university officials encouraged students to go outdoors and enjoy the unusual weather conditions. Sledding was prohibited only along Tech Drive and behind moving vehicles. The university made no effort to inform students of a safe area for sledding and in fact did not insure that there was such an area. The University Police's "no sledding" policy was at odds with the Housing Department's winter storms bulletin and reflects defendants' knowledge of the dangers faced by students who chose to engage in sledding on campus hills unsuited to such winter activity. The testimony of police personnel and Glenn Theis, acting director of the Housing Department, evidences that prior injuries were sustained by students engaged in such activities.
On the other hand, a person is legally required to recognize when his conduct involves a risk of harm and to take reasonable precautions to prevent such harm. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991); Dobson, supra.
Depositions of students who were sledding at the Assembly Center on the night of the accident were introduced into evidence. According to the other sledders, the large garbage can lid was the sled of choice because it would go faster and farther and could hold several people on one ride. Several students noted, however, the lid's tendency to spin and the lack of control over its direction. It was also noted that the lid would go even faster and travel farther when the sledders rode lying on their backs, headfirst down the hill.
Before the accident, the garbage can lid had traveled as far as the stadium on the far side of the parking lot and several students stated that the lid had even hit the stadium fence a few times. Although the light poles were noticed by the students, most of them did not perceive the danger of striking one of the poles.
Earl Pitre, Jr., was a 20-year-old sophomore at the time of the accident. Earl, being from South Louisiana, had only experienced such winter conditions on a family ski trip to Colorado a few years previously. He, like the other students, saw the light poles in the parking lot and should have recognized the unpredictability and lack of control experienced by sledders who utilized the large garbage can lid to slide down the hill. Thus, he should have considered the danger posed by the light poles in deciding to slide down the hill on the lid with three other students, headfirst, lying on his back, with no control over the direction or speed of the "sled".
On the other hand, Earl was the type of student that the trial court believed would have complied with any warning or prohibition given by the university. The winter storms bulletin, however, created an illusion of a safe activity. We should also be mindful of the testimony of Sgt. Bennett, who stated, "... a young person does not see danger like a grown-up does around here and one of our duties is to try to stop them before they start..." We would add to Bennett's comment, "and to protect them from greater injury."
A recent decision by the Louisiana Supreme Court on comparative fault is similar to the present situation. In Campbell v. State, Through D.O.T.D., 94-1052 (La. 01/17/95), 648 So.2d 898, the court stated:
Ledford's negligence [falling asleep at the wheel] set the course for an accident to happen, but the harm or injuries to the guest passengers in Ledford's vehicle were a direct result of the impact with the concrete bridge abutment [when a guardrail would have reduced the force of the impact by 80% and significantly reduced the injuries].
In Campbell, supra, the court found DOTD's fault more substantial than the fault of the driver in causing the injuries. The percentage of fault was set at 75% to DOTD and 25% to the driver.
Certainly Earl's action in sledding down the hill set the course for the accident to happen. The instant case is more analogous to Socorro, supra. As stated in Socorro; *670 "[t]he duty to recognize and take reasonable precautions to prevent harm to oneself is especially applicable to the inherently dangerous activity of diving into natural bodies of water" or as in this case, sledding down a hill into a parking lot. In Socorro, the supreme court apportioned 75% of the fault to the plaintiff whose injuries resulted in his quadriplegic condition. Recognizing that the assignment of fault is somewhat arbitrary, we find, after a comparison of duty, breach and causation, the defendant's fault should be set at 25% and Earl's at 75%.[1]

Damages
Appellate courts may award damages where the trier of fact erroneously fails to do so and where the record contains sufficient proof of such damages. Beckham v. St. Paul Fire and Marine Insurance Co., 614 So.2d 760 (La.App. 2d Cir.1993); Daugherty v. Casualty Reciprocal Exchange Insurance Co., 522 So.2d 1323 (La.App. 2d Cir. 1988).
In making an initial award of damages, we are not limited to either the highest or lowest in the range of awards which we would have affirmed on appeal. Our award should represent an amount which is fair and just for the damages sustained. Weaver, supra; Morris v. Owens-Illinois, Inc., 582 So.2d 1349 (La.App. 2d Cir.1991), writ denied, 588 So.2d 1119 (La.1991); Simmons v. City of Monroe, 588 So.2d 1357 (La.App. 2d Cir.1992), writ denied, 591 So.2d 708 (La. 1992).
Because Earl Pitre, Jr., was partially at fault in causing the accident, plaintiffs are entitled to recover their damages, minus a percentage thereof corresponding to Earl's portion of comparative fault. Socorro, supra; Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La.1988).

Earl Pitre, Jr.'s Damages
General Damages
General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of life or lifestyle that cannot be measured definitively in terms of money. Boswell v. Roy O. Martin Lumber Co., Inc., 363 So.2d 506 (La.1978); Beckham, supra.
The accident occurred around 11:00 p.m. on January 7, 1988. Because of weather conditions, Earl did not arrive in Lake Charles, his hometown, until the morning following his accident. Upon his arrival at St. Patrick's Hospital, he was placed in intensive care. Examinations revealed a total loss of neurological function below the T-6 level. X-rays showed fractures of the posterior elements of the T-6 and T-7 and the transverse process of T-8. One of Earl's lungs collapsed and he developed pneumonia. Because of these complications, Earl's doctors could not remove bone fragments or stretch his spinal cord back to its original position until seven days after the accident. At that time, luque rods were inserted and grafted into place with bone grafts from Earl's hips, an infrequently performed procedure made necessary because of Earl's size (6'0" tall, approximately 200 pounds).
Earl was transferred to F. Edward Hebert Rehabilitation Hospital in New Orleans on January 25, 1988, for physical and respiratory therapy. During this first stay, Earl was taught to do "wheelies" in his wheelchair for relief of pressure and prevention of bedsores. Earl also learned how to get back into his wheelchair should he fall. Therapists showed Earl how to dress and bathe himself and how to insert a catheter for urination. He also learned how to perform the tedious bowel program required by his condition.
On March 4, 1988, Earl was discharged from F. Edward Hebert and allowed to go home. However, on the trip back to Lake Charles, he began running a high temperature and spotted blood in his urine. Earl was taken to the emergency room at Lake Charles Memorial Hospital where he was diagnosed with a urinary tract infection. He was subsequently admitted to the hospital *671 that evening and was discharged on March 10th. Earl returned to F. Edward Hebert on April 4th for three more weeks of intensive rehabilitation.
Earl has experienced recurring infections since the accident. He experiences three to four urinary tract infections a year which are frequently stress-related. Additionally, he has been hospitalized for other infections and complications, such as extreme swelling and clotting and bladder and kidney problems.
Earl's physicians expect continued problems with urinary tract infections and bladder stones, which are secondary to his bladder condition and recurring infections. Because of the level of spinal injury, Earl's lung capacity is impaired and he is prone to pulmonary infections. Potential long term risks and complications include loss of renal function, decubitis ulcers, chronic prostatis, urethritis, infections of the scrotal sac, contracture deformities of the bone, thrombophlebitis and other musculoskeletal problems.
In spite of his permanent paralysis and paraplegic condition and all of the complications related thereto, Earl enrolled in summer school four months after his accident. He returned to Louisiana Tech in the fall of 1988 and went on to obtain a degree in human resources management. Earl then moved to Baton Rouge to attend law school at Southern University from where he was scheduled to receive his law degree this past summer.
Earl faces obstacles daily arising out of his impairment. While at law school, Earl was forced to live some 20 miles away from the campus because there was no closer "accessible" apartment. Earl has difficulty doing every day tasks such as cooking, making his bed, vacuuming and doing the laundry. At school, parking was only one of the problems Earl encountered; he also had difficulty taking exams and using the law library.
No money can adequately compensate an active 20-year-old for the loss of his legs. We find that a general damage award of $2,500,000, while in no way a substitute for the loss of mobility and functioning, will compensate Earl for his permanent disability, pain and suffering, mental anguish and loss of quality and enjoyment of life, past and future.
Special Damages
Medical Expenses
Medical expenses, past and future, which are incurred by an injured plaintiff, are recoverable as an element of damages. Thames v. Zerangue, 411 So.2d 17 (La.1982). The record contains uncontroverted evidence of Earl's past medical expenses in the amount of $128,770.87, which is inclusive of the costs incurred by the Pitres in making their home accessible to Earl. These costs are recoverable by plaintiffs.
The burden of proof in a claim for future medical expenses is a preponderance of the evidence. Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971); Harig v. State Through the Board of Elementary and Secondary Education, 25,702 (La.App. 2d Cir. 03/30/94), 635 So.2d 485. An award for future medical expenses is by nature somewhat speculative. Odom v. Claiborne Electric Cooperative, Inc., 623 So.2d 217 (La.App. 2d Cir.1993). Nonetheless, future medical expenses must be established with some degree of certainty. Underwood v. Dunbar, 628 So.2d 211 (La.App. 2d Cir.1993), writ denied, 94-0026 (La. 02/25/94), 632 So.2d 767. Medical testimony is needed to establish that such expenses are indicated and to set out their probable cost. Harig, supra; Durkee v. City of Shreveport, 587 So.2d 722 (La.App. 2d Cir.1991), writ denied, 590 So.2d 68 (La.1991).
Plaintiffs presented the testimony of Dr. Glen Hebert, an expert in vocational rehabilitation counseling and life care planning, regarding the cost of Earl's future care. Earl's life care plan includes anticipated future medical expenses, an evaluation to determine whether Earl can be fitted with leg braces which electronically stimulate leg movement and necessary equipment such as wheelchairs, a walker, adaptive furniture and recreational equipment and an environmental control unit. Dr. Hebert also factored in the costs of modifying a house in which Earl could achieve his goal of independent living. Plaintiffs' economist, Dr. Gerald Lee, testified that Earl's life care plan had a present *672 value of $1,163,831. This amount is warranted by the testimony of Earl's physicians as well as the life care plan prepared by Dr. Hebert.
Loss of Earnings and Earning Capacity
Lost earnings need not be precisely proven, but they must be shown with reasonable certainty. Moore v. Chrysler Corp., 596 So.2d 225 (La.App. 2d Cir.1992), writs denied, 599 So.2d 316, 317 (La.1992); Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985). To recover, a plaintiff must show proof to reasonably establish his claim. Weber v. Brignac, 568 So.2d 1129 (La.App. 5th Cir.1990).
Earl testified that prior to his accident, his intentions were to do road construction work during the summers until his graduation from Louisiana Tech in order to pay for his new truck. However, the record reflects that in previous years, Earl had chosen to attend summer school rather than work. We find insufficient proof to support an award of past lost wages.
Loss of earning capacity is not the same as lost wages; earning capacity refers to a person's potential and is not necessarily determined by actual loss. Walker v. Bankston, 571 So.2d 690 (La.App. 2d Cir. 1990); Finnie v. Vallee, 620 So.2d 897 (La. App. 4th Cir.1993), writ denied, 625 So.2d 1040 (La.1993). Damages for loss of earning capacity are based on the injured person's ability to earn. Hobgood v. Aucoin, 574 So.2d 344 (La.1990); Laing v. American Honda Motor Co., Inc., 628 So.2d 196 (La. App. 2d Cir.1993), writ denied, 94-0375 (La. 03/25/94), 635 So.2d 239.
In determining whether a plaintiff is entitled to recover for loss of earning capacity, the court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The inquiry is what plaintiff might have been able to earn but for his injuries and what he may now earn given his resulting condition. Finnie, supra.
At the time of the accident, Earl was majoring in finance. He testified that after the accident, he changed his major to human resources management and that he obtained his undergraduate degree in this field from Louisiana Tech. Because of lack of career opportunities in his chosen field, Earl decided to attend law school. As an attorney, Earl testified that his beginning salary should be in the range of $36,000 to $40,000. While Dr. Hebert did testify that Earl's disability will require adjustments in his needs, we find that the evidence was insufficient to show with reasonable certainty how his condition would impact his earning capacity as an attorney. Therefore, we make no award for loss of earning capacity.
Earl and Joan Pitre's Damages
Loss of Consortium
Parents may recover damages for loss of consortium for the loss of aid, assistance, companionship, affection, society and service attributable to the injury of a child. C.C. Art. 2315; Worsham v. Walker, 498 So.2d 260 (La.App. 1st Cir.1986), writ denied, 500 So.2d 423, 424 (La.1987).
Earl Pitre, Sr. testified that he and his son have always had a close relationship. Prior to Earl's accident, the two enjoyed hunting, fishing and other recreational activities together. As a result of Earl's injuries, Earl and his father can no longer enjoy the activities they once participated in together. Mr. Pitre testified that the Pitres, who had previously traveled extensively as a family, are now unable to travel without making considerable adjustments for Earl's disability.
Joan Pitre testified that she has assumed most of the responsibility for Earl's care. Since the accident, she and her husband are limited in what they can do because Earl is not as independent as he was previously. Additionally, her relationship with Earl has changed as a result of the accident.
We note that Earl and his parents have continued to be close and enjoy a loving, caring relationship. However, there has been a change in this relationship as a result of the accident. We feel that an award of $35,000 to each parent is warranted in this case.

CONCLUSION
For the reasons set forth above, the judgment of the trial court is REVERSED and judgment is RENDERED as follows:

*673 (1) Plaintiff, Earl Pitre, Jr. is awarded the following damages, with legal interest from date of judicial demand, subject to reduction according to his fault (75%):

 General Damages: $2,500,000.00
 Special Damages: 1,292,601.87
 ____________
 $3,792,601.87

(2) Plaintiffs, Earl and Joan Pitre, are each awarded $35,000, together with legal interest from date of judicial demand, for loss of consortium, subject to reduction according to plaintiff's, Earl Pitre, Jr.'s, fault (75%).
(3) Costs, here and below, are taxed against defendants.
HIGHTOWER, J., dissents with written reasons.
HIGHTOWER, Judge, dissenting. The majority, after administering itself a strong shot of "law of the case," grasps tightly the earlier 3-2 decision (which, incidentally, changed an initial 2-1 decision) and boldly declares that the duty issue stands closed. I find myself, however, strongly disagreeing.
The law of the case concept merely expresses the general practice of courts to refuse to reopen what has been decided. Day, supra. That approach nevertheless is one of practice or court policy, and not of inflexible law, so that appellate courts may exercise discretion in its application. Dodson v. Community Blood Center of La., Inc., 633 So.2d 252 (La.App. 1st Cir.1993), writs denied, 93-3158, 93-3174 (La. 03/18/94), 634 So.2d 850, 851; Brumfield v. Dyson, 418 So.2d 21 (La. App. 1st Cir.1982), writ denied, 422 So.2d 162 (La.1982). The theory certainly should not be applied when to do so accomplishes or continues an obvious injustice, or where the former appellate ruling is palpably erroneous. Day, supra; Alessi v. Belanger, 93 2047 (La.App. 1st Cir. 10/07/94), 644 So.2d 778; Widman v. Widman, 93-613 (La.App. 3d Cir. 02/02/94), 631 So.2d 689; Dodson, supra.
This case came here earlier, when the trial court granted defendants' motion for summary judgment. An initial appellate panel affirmed, holding that the university owed plaintiff no duty under the circumstances involved. On rehearing, the 3-2 majority reversed, essentially predicating its determination that Louisiana Tech owed Pitre a duty upon two pronouncements: that a special relationship exists between a university and a resident student; and that it is always improper to consider a plaintiff's knowledge in ascertaining a defendant's duty. Inasmuch as both of these underpinnings embody fallacious postures of law, the prior decision cannot be shielded by "the law of the case."[1]
Present day colleges and universities no longer assume a role in loco parentis. Whatever responsibility may have existed in an earlier era, today's trustees and administrators have been forced to yield to the expanding privileges of their students. Modern college students, no longer considered children of tender years, inevitably will be involved in relatively rare, even sometimes tragic, incidents. Yet acceptance of the majority's response, by imposing the duties which plaintiff seeks, would command from our institutions of higher learning such increased cost, and enhanced burdens, as could seriously impede their vital educational missions. For a discussion of the outmoded in loco parentis doctrine, see Alumni Association v. Sullivan, 524 Pa. 356, 572 A.2d 1209 (1990); Millard v. Lambda Chi Alpha, 416 Pa.Super. 475, 611 A.2d 715 (1992). Tech plainly is not the insurer of its students' safety. See Denver v. Whitlock, 744 P.2d 54 (Colo.1987); Beach v. University of Utah, 726 P.2d 413 (Utah 1986). Even more clearly, adult students of a university are responsible for protecting themselves from their own reckless actions.
As for a plaintiff's knowledge, although "assumption of the risk" no longer bars recovery, the supreme court has not abandoned knowledge or awareness as a criterion in assessing duty. Instead, when a potentially *674 dangerous condition is obvious, it may be found that a defendant owed no duty:
[C]are should be taken to note that we maintain our policy that "the duty which a landowner owes to persons entering his property is governed by a standard of reasonableness, and that a potentially dangerous condition that should be obvious to all comers is not, in all instances, unreasonably dangerous." [Citations omitted, emphasis in original.] Therefore, under a duty/risk analysis, if the facts of a particular case warrant, there could be a finding that a defendant owed no duty under the circumstances....
Socorro v. City of New Orleans, 579 So.2d 931, 941-42 (La.1991). The instant case convincingly presents such a situation. Before a duty to warn or protect arises, an unreasonably dangerous condition must be found. And, in the process of that inquiry here, knowledge enters the equation.
The light post which Pitre struck could clearly be seen in the parking lot. Moreover, he had passed by the several posts there on numerous occasions, even during his earlier sleddings on the night of the accident. Anent utility, the lamp posts served to illuminate the stadium parking lot and ensure safe passage of pedestrians and motorists alike. Hence, the object in question did not become dangerous until Pitre chose to sled, on his back, head first, down a hill on an apparatus over which he had no control. Indeed, at trial, Pitre acknowledged that he did not need to be warned of the risk of colliding with a fixed object while travelling at a high speed. Furthermore, any danger in sledding at the chosen location could easily be observed byto borrow from Socorro"all comers." Accordingly, the peril, if any, presented by the light post did not rise to the level of being unreasonably dangerous.
Nor do I agree that the winter storms bulletin, distributed through Tech's housing office, encouraged a dangerous activity. In its reasons for judgment, the trial court commented on the purpose of this missive, noting that it served to remind the students to use common sense and good judgment while sledding. The publication did not offer a blanket sanction of all sledding in any area, and under any circumstance. The housing office set forth only certain examples of poor judgment encountered during past experiences: sledding behind vehicles and sliding down the hill into oncoming traffic. It would have been impossible for the document to enunciate and caution against every conceivable activity whereby a student could be injured because of the weather conditions. The bulletin did warn against using poor judgment, however, which obviously precipitated this accident.
In stating that sledding itself is not innately dangerous, the trial court accurately compared the present situation to others which might transpire on campus:
The activity of sledding is not inherently dangerous any more than is skateboarding, riding a bicycle, or driving. All of these activities require the participant to take responsibility for guiding the chosen vehicular device to avoid collision. Certainly there is likelihood of injury if the user of any of these devices collides with a fixed object. We take for granted that the user knows this. In this case, all participants were certainly aware of that fundamental principle.... The combination of the weather conditions, the sledding apparatus, and the position of the sledders combined to cause this tragedy.
Directly put, plaintiff's injuries resulted from his own choices. As a 20-year-old adult, he chose to lay backwards on a garbage lid and to slide, head first and for the seventh time, down a snow-covered incline toward a well-lit parking lot containing several light posts.
Said again, and in summary, plaintiff's injuries resulted from his own choices. No commonsense, fair-minded approach to "duty" should now impose the consequences of his actions upon this state's tax-paying citizens. Indeed, to do so stretches the law's appropriate role beyond all recognition, while divining a responsibility by society toward those who engage in virtually any bizarre *675 activity. Hopefully, such a perversion of the tort system will not long persist.
I dissent.
NOTES
[1] Although there was some disagreement among the majority, this percentage assessment represents a consensus.
[1] The supreme court writ denial, 604 So.2d 998 (La.1992), which the majority maintains finalized the duty question, is not an affirmative endorsement of the original decision. Instead, it simply reads: "Review of the court of appeal's denial of defendant's motion for summary judgment is not warranted at this state of the proceeding."