688 So.2d 1324 (1997)
Jimmy HARVEY
v.
Robert A. TRAYLOR, Jr., et al.
No. 96-CA-1321.
Court of Appeal of Louisiana, Fourth Circuit.
February 5, 1997.
Writ Denied April 18, 1997.
*1327 Darleen M. Jacobs, James L. Yates, New Orleans, for Plaintiff/Appellant Jimmy Harvey.
Thomas D. Fazio, McCollister & McCleary, Baton Rouge, for Defendant/Appellant Louisiana Insurance Guaranty Asso.
Thomas J. Eppling, Michael Joey Bernard, Valerie A. Young, Staines, Eppling & Myers, New Orleans, for Defendant/Appellant St. Bernard Parish Sheriff's Office.
Before KLEES, LOBRANO and ARMSTRONG, JJ.
LOBRANO, Judge.
This appeal arises from a judgment in favor of plaintiff, Jimmy Harvey and against defendants, Robert Traylor, the St. Bernard Parish Sheriff's Office, Pelican State Mutual Insurance Company and the Louisiana Insurance Guaranty Association for injuries Harvey sustained when his vehicle was struck by a vehicle owned by the St. Bernard Parish Sheriff's Office and driven by Robert Traylor.

FACTS AND PROCEDURAL HISTORY:
On the evening of December 18, 1989, plaintiff, Jimmy Harvey was driving on St. Bernard Highway. As he attempted to execute a left hand turn onto Highland Drive, his vehicle was struck on the driver's side by a vehicle owned by the Sheriff's Department and driven by Robert Traylor, Jr., a deputy sheriff. Traylor alleged that a pick-up truck suddenly entered St. Bernard Highway in front of him, causing him to slam on his brakes and collide with plaintiff's vehicle.
As a result of the collision, plaintiff sustained injuries to the cervical and lumbar regions of his spine. He was transported by ambulance to DeLaRonde Hospital. Plaintiff's treatment subsequently included a cervical fusion on October 30, 1991 at the C6-7 disc space.
On October 30, 1990, plaintiff filed suit seeking damages for the injuries he sustained in the accident. Named as defendant were Robert Traylor, Jr., the Parish of St. Bernard and Pelican State Mutual Insurance Company, liability insurer for the St. Bernard Parish Sheriff's Office.
The Parish of St. Bernard filed an Exception of No Cause of Action asserting that it had no control over the Sheriff's Office or its deputies and therefore, could not be held liable as a master or employer of Robert Traylor pursuant to Civil Code Article 2320. The exception was granted. In a supplemental and amending petition, the St. Bernard Sheriff's Office, a separate entity, was added as a party defendant. Answers were filed on behalf of the sheriff's office and Pelican *1328 State.[1] Due to the subsequent insolvency of Pelican State, the Louisiana Insurance Guaranty Assurance Association (LIGA) was added as a defendant by supplemental and amending petition.
The matter was tried over a period of five months. The trial began on February 13, 1995. It was resumed on July 1st and 2nd, 1995. It was thereafter held open for the testimony of unavailable witnesses. It was again resumed and completed on July 14, 1995.
Judgment was rendered in favor of plaintiff and against Robert Traylor, Jr., the Parish of St. Bernard, Pelican State and LIGA on October 30, 1995 in the amount of $364,813.27. The award was itemized as follows:

Pain and suffering Past,
present and future $170,000.00
Past medical expenses 36,813.27
Future medical expenses 10,000.00
Lost wages and loss of
earning capacity 130,000.00
 ___________
Total $346,813.27

In its reasons for judgment, the trial court found that Traylor's conduct was the sole cause of the accident; that plaintiff was completely disabled from work as a laborer; and, that plaintiff's age and educational level made him unsuitable for training in a new career.
Both plaintiff and LIGA appealed. The Sheriff's Office answered plaintiff's appeal raising the issues of liability and damages. However, while the appeal was pending, the Sheriff's Office also filed a motion to dismiss asserting that it was not named in the judgment. This Court, on October 9, 1996, referred that issue to the appeal panel assigned to hear the merits. Plaintiff then sought leave of court to file a supplemental brief arguing the issue of the defective judgment. The motion was granted on October 10, 1996.
On October 17, 1996, long after this appeal was granted and the record was lodged in this court, the trial court, on its own motion, rendered an amended judgment substituting the Sheriff's Office as defendant in place of the Parish of St. Bernard. The Sheriff's Office then filed a Petition for Nullity with the trial court seeking to have the amended judgment declared null and void.
In this Court, LIGA argues that: (1) it was error to render judgment against Traylor since he was never served; (2) the court erred in finding Traylor solely at fault in causing the collision because he was faced with an unavoidable situation; (3) the court erred in its assessment of damages, specifically ignoring the evidence of plaintiff's pre-accident condition and (4) it was error for the court to hold LIGA responsible for the full amount of the judgment and ignoring the statutory cap, not only for the principal of the judgment, but for legal interest and costs.
The Sheriff's Office argues the issues of liability and quantum as well as the error of the trial court in amending its judgment. Plaintiff argues that the correct defendant to be cast in judgment was the Sheriff's office, and not St. Bernard Parish. Plaintiff also appeals the trial court judgment because of the court's failure to award damages for loss of enjoyment of life and loss of personal services.

THE AMENDED JUDGMENT:
Plaintiff appeals the naming of the Parish of St. Bernard as a defendant in the October 30, 1995 judgment, asserting that the correct defendant is the St. Bernard Parish Sheriff's Office. Plaintiff requests that this Court amend the judgment to correct this error citing Code of Civil Procedure article 2164 as authority to do so. The Sheriff's Office responds that this Court has no jurisdiction to amend the judgment because plaintiff failed to initiate the proper relief by way of either a timely motion for a new trial or by appeal. See, LaBove v. Theriot, 597 So.2d 1007, 1010 (La.1992). The Sheriff further argues that the amended judgment of October 17, 1996, is a nullity and without legal effect because *1329 once the order of appeal was granted, the trial court was divested of jurisdiction over all matters reviewable on appeal. The Sheriff's Office requests that it be dismissed from this appeal and that plaintiff be precluded from raising the issue of a defective judgment.
Without question, the trial court was without jurisdiction to amend the judgment on October 17, 1996. The order of appeal had already been granted, and the trial court's jurisdiction was limited to only those actions specified in Code of Civil Procedure art. 2088 of which amending the judgment is not included. Furthermore, changing the name of a party cast in judgment is a substantive change prohibited by Code of Civil Procedure article 1951. A substantive change requires a contradictory proceeding. Tolmas v. Weichert, 616 So.2d 244 (La.App. 4th Cir.1993), writ denied 620 So.2d 878 (La. 1993). For these reasons, the amended judgment is an absolute nullity and of no effect. However, plaintiff did assign as error on appeal the defect in the original judgment. We now address the merits of that issue.
Louisiana Code of Civil Procedure article 2164 provides in pertinent part:
The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal ...
Based on our review of the record, it is obvious that the trial court's intent was to cast the Sheriff's Office in judgment. The Parish of St. Bernard was dismissed from the suit on December 28, 1990, almost five years before trial; the Sheriff's Office was substituted as proper party defendant; the Sheriff's Office's liability insurer, Pelican State Mutual Insurance Company was named as a party defendant and subsequently LIGA, as successor to Pelican State, was named as a party defendant. The Sheriff's Office and its insurer defended the case at the trial level and appealed the issues of liability and quantum. The adverse driver, Traylor, was an employee of the Sheriff's Office. Undoubtedly, the attorney for the Sheriff did not notice the defect in the judgment until after the appeal was lodged and after briefs were filed addressing the merits.[2] Furthermore, we note that plaintiff also appealed the trial court judgment. Although his initial brief did not address this error (presumably because he was not aware of it), his subsequent, supplemental brief did.[3]
Despite the Sheriff's arguments to the contrary, it would be a grave injustice to permit the judgment to stand as written. There can be no doubt that it was a clerical error to name St. Bernard Parish rather than the St. Bernard Sheriff's Office as the party to be cast in judgment. We therefore amend the judgment accordingly and deny the Sheriff's motion to dismiss.
We also agree that Robert Traylor could not be cast in judgment since he was never cited nor served. Plaintiff concedes this issue and we will amend the judgment to delete Traylor as a party cast in judgment.

LIABILITY:
Both LIGA and the Sheriff's Office argue that Traylor was faced with an unavoidable situation which absolves him from any fault. They also argue that plaintiff was contributorily negligent and that plaintiff's injuries were not caused by the accident, but pre-dated the accident. We disagree.

a) Cause of the accident:

LIGA argues that Traylor was travelling at the posted speed limit and lost control of his vehicle solely because of the emergency situation caused when a black pick-up truck suddenly entered the highway in front of him. This sudden or unexpected occurrence made it impossible for Traylor to avoid colliding with plaintiff's vehicle. LIGA further argues that the wet road conditions *1330 exacerbated the sudden emergency situation by causing Traylor's vehicle to skid out of control.
In his reasons for judgment, the trial court found that "Mr. Traylor was going too fast for the conditions and failed to keep a proper lookout preceding the accident". The trial court further dismissed "Mr. Traylor's claim that a black truck suddenly pulled in front of him, causing him to lose control; finding it unconvincing at best". After review of the evidence with respect to this argument we cannot find any manifest error in the trial court's conclusion.
Traylor testified that he was travelling at or near the speed limit when he observed plaintiff stopped in front of him. He stated that he began to slow down to stop behind plaintiff who was waiting to turn left. Traylor testified that plaintiff's left turn signal was blinking. At that point, Traylor testified that a black pick-up truck entered onto St. Bernard Highway causing him to slam on his brakes. His car began to slide on the rain wet road and eventually collided with plaintiff as he was beginning his turn.
Plaintiff's witnesses contradicted Traylor's testimony that he began to slow down after he observed plaintiff stopped.[4] The witnesses not only did not see Traylor slow down but actually saw and heard his vehicle increase its speed. The shear violence of the impact, which demolished plaintiff's car and moved it a considerable distance from the intersection, indicates Traylor was traveling too fast under the circumstances.
Further, Traylor's testimony that a black pick-up truck suddenly entered the highway in front of him was correctly rejected by the trial court. There simply is no evidence to corroborate Traylor's self-serving testimony to this effect. Witnesses for plaintiff did not see any truck or any other vehicle suddenly enter the highway. Ronnie Campbell observed a truck parked behind plaintiff but did not observe the truck suddenly enter the road in front of Traylor. In addition, Randy Payne observed Traylor looking down Caluda Lane, the cross street before Highland Drive, just prior to the accident.
We simply cannot find any manifest error in the finding that Traylor was negligent in the operation of his vehicle under the adverse weather conditions existing at the time. He failed to keep a proper lookout under the circumstances, and failed to maintain control of his vehicle. See, Stapleton v. Great Lakes Chemical Corp., 627 So.2d 1358, 1361 (La. 1993); Arceneaux v. Wallis, 94-2016 (La. App. 4th Cir. 4/16/95), 654 So.2d 1117, 1119; Coley v. State of Louisiana, 621 So.2d 41, 48 (La.App. 2nd Cir.1993).

b) Contributory negligence of plaintiff:

LIGA contends that plaintiff was at fault for not meeting the requirements imposed by Louisiana Revised Statute 32:104, which requires that a left turning motorist give a proper signal and must observe that the turn can be made without endangering an oncoming or overtaking vehicle.
The testimony is more than convincing that plaintiff was stopped with his left turn signal blinking waiting to turn when he was struck by Traylor.[5] Traylor was not attempting to pass plaintiff. He was slowing down to stop. Plaintiff testified that he looked in his side rear view mirror and did not see any vehicle attempting to pass. The accident occurred after Traylor lost control and entered the left lane, swerved back into the right lane and struck plaintiff. Traylor testified that plaintiff did not make any maneuver or take any action which contributed *1331 to the accident. Plaintiff took all precautions mandated by law before making his turn.
Furthermore, any observation by plaintiff of Traylor's approaching vehicle would not be relevant to the issue of plaintiff's fault under the facts of this case. Given the fact that the accident happened at an intersection of a two lane highway, Traylor's only option was to stop behind plaintiff until plaintiff completed his turn. Traylor could not have legally passed on plaintiff's left because such a maneuver is illegal at an intersection. La. R.S. 32:76. Plaintiff had every reason to expect Traylor, or any other rear approaching motorist, to stop behind him as no passing maneuver was allowed. It would be unreasonable to conclude that plaintiff should have anticipated Traylor's vehicle skidding out of control and striking his vehicle as he turned. There was simply no duty on plaintiff to do anything more than what he did in this case.

c) Plaintiff's pre-existing condition:

LIGA asserts that it was error for the trial court to conclude that plaintiff's injuries were caused by the accident. LIGA's argument is based on the fact that plaintiff's medical records from Charity Hospital from 1986 through 1989 reflect that plaintiff complained of similar problems prior to the accident. The Charity records consist of approximately seven visits over a three year period. When questioned, plaintiff testified that his treatment at Charity Hospital was primarily for high blood pressure. The fact that plaintiff complained of left arm and elbow pain and weakness and numbness in two of his fingers up to the morning of the accident is undeniable. The medical records speak for themselves. However, the records do not reflect the constant and consistent complaints of severe pain expressed by plaintiff after the accident. Plaintiff's pre-accident complaints are not comparable to his post-accident complaints.
While Dr. Hamsa, an orthopedic surgeon who first examined plaintiff in May, 1990, agreed that plaintiff's prior complaints in regards to his left arm were consistent with his post accident diagnoses of the lesion at the C6-7 level, Dr. Hamsa deferred to the opinion of plaintiff's treating physician, Dr. DiLeo. Dr. Hamsa did not rule out the fact that plaintiff's cervical disc problem was caused by the accident.
Dr. Olson, a neurologist, first saw plaintiff on November 19, 1990 as a referral by Dr. Hamsa. He testified that plaintiff's pre-accident complaints of left arm pain and weakness could not be related to plaintiff's cervical damage at the C6 level. Dr. LeClercq, a neurosurgeon who performed a disc excision on October 30, 1991, testified that plaintiff's prior complaints did not affect his opinion that plaintiff's cervical disc problem was caused by an injury to his neck sustained in the accident.
Dr. DiLeo, plaintiff's primary physician, stated that plaintiff's preaccident complaints show that the accident may have aggravated a pre-existing condition. He stated emphatically that plaintiff's prior complaints did not change his diagnosis or medical opinion that the accident caused plaintiff's injuries.
First, we agree that there was no error in the conclusion that plaintiff's injuries were caused by the accident. Second, even if plaintiff had a preexisting condition, the evidence is conclusive that the accident seriously exacerbated those injuries. It is well recognized that a defendant takes his victim as he find him and is responsible for all the natural and probable consequences of his tortious conduct. Where the defendant's negligent action aggravates a preexisting injury, he must compensate the victim for the full extent of this aggravation. Perniciaro v. Brinch, 384 So.2d 392, 395-396 (La.1980).

EXCESSIVE DAMAGES:
LIGA argues the trial court erred by awarding excessive damages for future lost wages, general damages and future medical costs.
Plaintiff asserts the trial court erred by failing to award damages for loss of enjoyment of life and loss of personal services.

*1332 a) Lost wages/loss of earning capacity:

The trial court awarded plaintiff $130,000.00 for "his lost wages and loss of earning capacity". The court took into account plaintiff's "work history, education, mental capacity and age".
In determining an award for loss of earnings and earning capacity, what the plaintiff earned before and after the injury does not necessarily constitute the measure. "While a plaintiff's earning capacity at the time of an injury is relevant, such figures are not necessarily determinative of his future ability to earn." Hobgood v. Aucoin, 574 So.2d 344, 346 (La.1990). The plaintiff need not be working or even in a certain profession to recover this type of award. Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before he injury. Earning capacity itself is not necessarily determined by actual loss. Id. Damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury deprived the plaintiff of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. Id.
In determining whether a plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition. Finnie v. Vallee, 620 So.2d 897 (La.App. 4th Cir.1993), writ denied, 625 So.2d 1040 (La.1993).
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident. Finnie, supra, 620 So.2d at 901.
Plaintiff called Dr. Melville Wolfson and LIGA called Dr. Kenneth Boudreaux to testify as to plaintiff's economic loss.
Dr. Wolfson based his calculations on an hourly wage of $7.38 for 40 hours per week, 52 weeks per year. That wage figure was the hourly wage plaintiff earned at his last job prior to the accident. It represented the highest wage plaintiff earned. We note that plaintiff only worked for three months at that wage and was laid off shortly before the accident.
Dr. Wolfson calculated post accident/pre-trial losses and post-trial losses. Plaintiff was 48 years old at the time of the accident and 53 years old at the conclusion of the trial. Dr. Wolfson based his calculations on plaintiff having 11 remaining work years. Using these and other economic factors, Dr. Wolfson estimated plaintiff's post-trial loss at 100% disability to be $136,889.00. He estimated his post accident/pre-trial loss to be $25,603.00. If plaintiff secures a job at his pre-accident earnings ($8,840.00 on the average), plaintiff's post accident loss would be $58,055.00.
Dr. Boudreaux did not use the $7.38 per hour figure and did not base his calculations on 52 weeks. Rather, Dr. Boudreaux used plaintiff's actual earnings for 1987, 1988 and 1989. Because plaintiff only worked an average of 6 months a year and his annual wage averaged $8,182.40. With the exception of his last job, plaintiff's other jobs paid $4.25 per hour. Using these factors, Dr. Boudreaux estimated plaintiff's post-accident/pre-trial loss at $20,756.00 before taxes and $19,169.00 after taxes. He calculated plaintiff's post-trial losses at 100% disability for 11.1 remaining years to range from $57,734.00 to $65,704.00.
*1333 Dr. Boudreaux testified that Dr. Wolfson should not have used the $7.38 per hour figure because plaintiff only had this job for three months.
Applying the law enunciated in Hobgood and Finnie, we cannot say the trial judge's award is so high as to constitute an abuse of discretion. While it is true that plaintiff only earned the higher hourly wage for three months, plaintiff certainly had the capacity to earn this wage. We must assume that plaintiff, if he wished to take advantage of his ability to earn this wage, could have pursued employment in this wage range had it not been for the accident.
Comparing and averaging the future loss projected by each economist supports our conclusion. Taking the $7.38 per hour wage for 40 hours per week, 52 weeks per year for 11 years, plaintiff's post-trial wage loss is $168,854.40. Using this same hourly wage for 6 months (26 weeks), plaintiff's post-trial loss is $84,427.20. Adding Dr. Wolfson's post accident/pre-trial loss amount, plaintiff's total loss with 100% disability would range from approximately $110,030.20 to $194,457.40.
Using the $4.25 per hour wage that plaintiff earned for 1987, 1988 and 1989 at 40 hours per week, 52 weeks per year for 11.1 years, plaintiff's posttrial loss is approximately $98,124.00. Using these figures for 6 months (26 weeks), plaintiff's post-trial loss would be approximately $49,062.00. Adding Dr. Boudreaux's post accident/pre-trial loss of $20,756.00 before taxes, plaintiff's total loss with 100% disability ranges from $69,818.00 to $118,880.00.
Averaging the above figures results in an earnings loss range of $89,924.41 to $156,667.20. The average of these figures is $123,295.80, slightly less than the amount awarded.
Plaintiff is totally disabled from the type of work he did prior to the accident. Even though, Ms. Favalara testified to a number of sedentary jobs that plaintiff might be able to do, given his age, poor educational skills (plaintiff is for all intents and purposes illiterate), hearing impairment and his crippling and disabling back and neck injuries, it would be unrealistic to expect that plaintiff would be able to secure gainful employment. Thus recognizing 100% disability as the gauge to compute future earnings and earning capacity loss is realistic and more probable than not. We find no merit in LIGA's argument in this regard.

b) General damages/future medical expenses:

LIGA asserts the trial court's award of $170,000.00 in past, present and future pain and suffering is excessive because it exceeds the high end of the permissible range under the circumstances of this case. LIGA also objects to the $10,000.00 award for future medical expenses arguing that the award is not supported by the record.
Before a damage award may be set aside as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the instant matter before it. Only after an analysis of the fact and circumstances peculiar to the instant case can a reviewing court determine if the award is either excessive or inadequate. The reviewing court may not merely look at past awards for similar injuries in the determination of whether the trier of fact abused its much discretion. Reck v. Stevens, 373 So.2d 498 (La.1979). Only after the record clearly reveals that the trial court abused its discretion may the reviewing court look to prior awards to the highest or lowest amount reasonably within the discretion afforded the court. Weaver v. Siegling, 569 So.2d 97, 100 (La.1991).
A claimant is entitled to compensation for future medical treatment if it is proven by a preponderance of the evidence that the future treatment is a result of the injuries sustained in the accident. See, Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971).
The medical evidence shows that plaintiff sustained a severe cervical strain with pain *1334 and spasm radiating into the shoulder and arm accompanied by 50% restriction of motion; severe ligamentous strain of the right and left trapezius muscle; numbness of his left wrist, arm and hand; severe pain in the left elbow; moderate to severe pain with restricted motion at the T-3 to T-6 levels; severe strain of the bilateral paraspinous thoracic region through L-5 with pronounced pain at L-4 and L-5; 50% restriction of movement of the lumbosacral spine; severe pain in the right frontal skull region resulting in headaches and dizziness; pain in his hips; and weakness and spasm in his legs and toes.
Plaintiff's injuries required that he wear a cervical collar, ace bandages and lumbar corset on his neck, elbow and back to restrict mobility. He was given oral pain medication as well as anti-inflammatory medication. His constant pain necessitated the use of steroid injections and an electro thermophore unit. By February, 1991, plaintiff was walking with a cane. In July, 1991 he underwent an MRI, myelogram and CAT scan. In October of 1991 plaintiff underwent a cervical fusion and excision of the cervical disc at the C6-C7 level.
Dr. DiLeo attributed an anatomic disability of 25% to 30% and a functional disability of 100%. Dr. LeClercq gave plaintiff a permanent disability rating of 10% to 15%. By the conclusion of the trial, plaintiff was still walking with a cane and still suffering with neck, shoulder, arm and leg pain. Given plaintiff's medical history after the accident, we do not find the $170,000.00 award in general damages an abuse of discretion.
We also find that the award for future medical expenses was reasonable. The medical evidence suggests that plaintiff will reach maximum improvement from the surgery in about one year. However, plaintiff's pain in his neck and lumbar region persists. Dr. DiLeo, plaintiff's treating physician, testified that plaintiff should be seen once every three months. Dr. DiLeo charges $75.00 per office visit or about $300.00 per year. In addition, plaintiff will continue to use paid medications, anti-inflammatory drugs and muscle relaxers. The record shows that plaintiff's cost for prescription drugs averaged approximately $725.00 per year.[6] If Mr. Harvey lives to age 70, which is not unreasonable, his medical expenses would continue for seventeen years. Considering a maximum cost of $1,025.00 per year the $10,000.00 award would compensate him for approximately ten years to age 63. We cannot say the award is so excessive as to constitute an abuse of discretion.

c) Loss of enjoyment of life/loss of personal services:

In his original brief, plaintiff asserted the trial court erred by not awarding damages for loss of enjoyment of life and loss of personal services because these elements of damages were proved at trial. LIGA responds that the issue of damages for loss of enjoyment of life is not before this court because plaintiff waived this claim at trial.
In a supplemental brief, plaintiff's appeal counsel, after consulting with plaintiff's trial counsel, has conceded the issue of damages for loss of enjoyment of life. Plaintiff's trial counsel confirmed that a stipulation was entered into at trial to exclude loss of enjoyment as a separate item of damages. As such, this item of damages is not before us. Uniform Rules, Court of Appeal, Rule 1-3.
Plaintiff maintains as error, however, the trial court's failure to award damages for loss of personal services. An award for loss of personal services is to compensate a plaintiff for the diminution in his ability to take care of his personal needs or to perform everyday household chores.
Dr. Melville Wolfson, in computing plaintiff's loss of personal service, used the minimum wage for 15 hours per week to age 70. He also applied a 5.4% wage increase and a 7.5% discount rate. He described the personal services as changing a light bulb, changing the oil in his car, yard work and *1335 other similar services one does for ones self. He calculated plaintiff's loss of personal service to be $49,345.00. Although Dr. Wolfson did not specifically state, the inference is that plaintiff would have to hire someone to perform these chores.
The medical testimony was to the effect that plaintiff was totally disabled from construction work but could do sedentary work as long as it did not require activity which aggravated plaintiff's condition. Plaintiff himself testified that he could only perform light duty work because of his neck, back and shoulder pain. He also testified that he can walk up to a mile and one half everyday and that he can stand several hours before his back begins to hurt. He stated on cross examination that he does grocery shopping and occasionally the house work.
At the time of trial, plaintiff and his wife had reconciled and he was residing with her. There is no evidence that she is unable to assist plaintiff with his every day needs. Plaintiff also testified that he does not own a lawnmower and doesn't cut grass. He stated he pays kids from the neighborhood $6.00 every two to three weeks to cut the lawn. It is not clear from the record if plaintiff ever cut his own grass. He also admitted that in his deposition he denied doing mechanic work on his car. He did say that he changed the oil prior to the accident.
Considering the minimal amount of evidence in support of plaintiff's claim, we cannot say the trial judge was clearly wrong in not awarding damages for loss of personal services.
Finally LIGA asserts the trial court erred in holding it liable for the full amount of the judgment, legal interest and pre-insolvency court costs. Specifically, LIGA argues that Louisiana Revised Statute 22:1382(A)(1)(iii) provides for a limitation on its obligation for payment of a covered claim, and that Revised Statutes 22:1382(A)(1)(b) and 22:1379(3)(d) impose liability for court costs and interest only from the date of Pelican State's insolvency. Plaintiff agrees with LIGA's position. The Sheriff's Office, however, argues that the amended versions of the above statutes should not be applied retroactively.
In 1990, Act 253 amended R.S. 22:1382 to provide that LIGA's liability for a covered claim is $150,000.00 per claim (minus a $100.00 deductible) with a maximum of $300,000.00 per occurrence. The amendment also provided that the applicable limits "shall be exhaustive of the entire liability of the association ... however arising ... except court costs incurred subsequent to the date of insolvency." Act 105 of 1990 added subsection 3(d) to R.S. 22:1379 which provides that a covered claim for which LIGA is responsible does not include, inter alia, court costs and interests incurred prior to insolvency.[7]
The accident in this case occurred on December 18, 1989. Suit was filed in October 1990. Pelican State was declared insolvent on February 26, 1993. LIGA argues Prejean v. Dixie Lloyds Ins. Co., 94-2979 (La.5/22/95), 655 So.2d 303, opinion modified *1336 on rehearing, 94-2979 (La.9/15/95), 660 So.2d 836 supports its position that the pivotal date in determining its obligation is the date of insolvency.
The Sheriff's Office argues that application of the amended statutes to limit LIGA's responsibility would disturb its vested contractual rights established when it purchased the insurance from Pelican State. In support of its vested rights' argument, the Sheriff primarily relies on the rationale of Segura v. Frank, 93-1271, 93-1401 (La.1/14/94), 630 So.2d 714, cert. denied, Allstate Insurance Company v. LIGA, 511 U.S. 1142, 114 S.Ct. 2165, 128 L.Ed.2d 887. The Sheriff also cites Habeney v. Bellow, 94-1600 (La.10/28/94), 645 So.2d 624 and Rivard v. Petroleum Transport Company, 95-0431 (La.App. 4th Cir. 9/28/95), 663 So.2d 755, in support of his position.
The issue in Segura v. Frank was whether application of a 1990 amendment which required a claimant to first exhaust his UM coverage prior to proceeding against LIGA applied to a pre-1990 accident. In discussing the contractual rights between the insured and the UM insurer, the court noted that those rights became vested when the policy of insurance was confected. The court made particular note of the fact that applying the statute retroactively would disturb the UM insurer's settled contractual rights. That is, the UM insurer contracted that it would be secondarily responsible in the underinsured situation. The court held, however, that disturbing those vested rights did not violate the contract clauses of the United States and Louisiana Constitutions because the UM insurers should have expected further regulation by the State in an already heavily regulated industry.
By analogy the Sheriff urges that its contractual rights (as an insured) will be divested by application of the limitations imposed by the above referenced amendments. The Sheriff argues that because LIGA "steps in the shoes" of the insurer, the contractual rights, established long before passage of the amendments, cannot be impaired by retroactive application of those amendments. We disagree.
In Prejean v. Dixie Lloyds Insurance Co., the issue was application of the 1990 amendment which limited LIGA's responsibility for court costs and legal interest to those incurred post insolvency. As in the instant case, the accident occurred prior to the amendment and the insolvency occurred subsequent to its enactment. The Supreme Court concluded, on rehearing, that the pivotal date was the date of insolvency. The court specifically noted that the claimant's cause of action against LIGA did not accrue until the insurer became insolvent, and thus "LIGA's obligation to pay court costs is governed by the law in effect on the date that insurer is declared insolvent, not by the law in effect on the date of the event giving rise to the insurer's liability." Prejean, supra, at 3, 660 So.2d at 837.
Following the rationale of Prejean, supra, we held that (1) court costs incurred post insolvency were not included in LIGA's statutory cap, (2) that LIGA's statutory maximum is applicable as of the date of insolvency and (3) legal interest is included within the statutory maximum. Although the Sheriff strenuously urges that his vested contractual rights in the Pelican State policy will be seriously impaired by application of the 1990 amendments, the Segura rationale is simply not applicable to this case. The UM carriers in Segura had contractual rights that were disturbed by legislative acts. That is, their right to expect the liability carrier to be primary in an underinsured scenario was fixed in the contract. In this case, the Sheriff's alleged vested rights were with Pelican State, who became insolvent. There never was a vested right to proceed against LIGA until that insolvency occurred. And when the right to proceed against LIGA did occur, the law provided that LIGA's responsibility was $150,000.00 per claimant, and $300,000.00 per occurrence (less $100.00 deductible). That statutory maximum includes post insolvency legal interest, but not post insolvency court costs. La. R.S. 22:1382(A)(1)(b); La. R.S. 22:1379(3)(d).
*1337 We are also well aware of the Sheriff's reliance on the notion that its cause of action accrued on the date of the accident, and thus its rights became vested on that date. Relying on Habeney v. Bellow, supra, the argument is made that when the accident happened, the right to be protected (without a statutory maximum) by LIGA vested and cannot be retroactively disturbed. Habeney involved a claimant who settled her claim against the UM carrier and reserved her rights to proceed against LIGA. Subsequent to the settlement, the legislature amended the statute to require the claimant to exhaust all UM coverage before proceeding against LIGA. The Supreme Court held that the amendment could not divest the claimant of her right to proceed against LIGA since at the time of her UM settlement, the law did not require her to exhaust her UM coverage.
The instant case is different from Habeney for the simple reason that there, the claimant's right against LIGA was vested at the time of her UM settlement, while here, the Sheriff had no vested right against LIGA until insolvency. Very simply, LIGA does not become part of the proceeding and no rights or obligations are existant until the insurer becomes insolvent. Accordingly, LIGA's total liability in this case is limited to $149,000.00, including post insolvency interest, but exclusive of post insolvency court costs.

DECREE:
For the foregoing reasons we amend the trial court judgment to delete Robert Traylor as a party cast in judgment, to substitute the St. Bernard Sheriff's office in place of the Parish of St. Bernard, and to limit LIGA's total responsibility to $149,900.00, inclusive of post insolvency legal interest, but exclusive of post insolvency court costs. In all other respects the judgment is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Robert Traylor, Jr. was never cited and served prior to trial and hence, no answer was filed by him. However, a witness subpoena was eventually served on him and he did testify at trial.
[2] The motion to dismiss was filed September 11, 1996. The Sheriff's brief was filed August 21, 1996.
[3] Plaintiff's initial brief was filed August 30, 1996, before the motion to dismiss was filed.
[4] Randy Lane, Ronnie Campbell, Herman Smiles, Roosevelt LaFrance and Emmanuel Payne Sr. testified that it appeared Traylor accelerated rather than slowed down, immediately prior to the accident. Their testimony also indicates that a pickup truck was stopped immediately behind plaintiff, and that Traylor swung around into the left lane when the truck stopped and hit plaintiff as he was turning. No one testified that a black truck pulled on to the highway right in front of Traylor.
[5] Even Traylor admits plaintiff's turn signal was on.
[6] Using the $1,450.00 in medical costs plaintiff incurred for 1992 to 1994.
[7] La. Revised Statute 22:1382(A)(1)(a) provides, in pertinent part:

A. The association shall:
(1)(a) Be obliged to the extent of the covered claims ... but such obligation shall include only that amount of each covered claim, except return premiums, which is in excess of one hundred dollars and is less than one hundred fifty dollars, per claim, subject to a maximum limit of three hundred thousand dollars per accident or occurrence, nor shall a claim for the portion of unearned premiums in excess of ten thousand dollars be allowed.
La. Revised Statute 22:1382(A)(1)(b) provides:
The applicable limit per claim and per accident or occurrence shall be exhaustive of the entire liability of the association under this Part, however arising, without regard to the nature of or basis for that liability, except court costs incurred subsequent to the date of insolvency.
La. Revised Statute 22:1379(3)(d) provides:
"Covered claim" shall not include any claim based on or arising from a pre-insolvency obligation of an insolvent insurer, including but not limited to contractual attorney's fees and expenses, statutory penalties and attorney's fees, court costs, interest and bond premiums, or any other expenses incurred prior to the determination of insolvency.