930 So.2d 999 (2006)
Sheila HOPKINS and Ronald Hopkins
v.
James P. HOWARD, Celadon Trucking Services, Inc. and Reliance National Insurance Company.
No. 2005-CA-0732.
Court of Appeal of Louisiana, Fourth Circuit.
April 5, 2006.
Writ Denied June 23, 2006.
*1000 Stephanie B. Laborde, Angela W. Adolph, Milling Benson Woodward, L.L.P., Baton Rouge, Raymond C. Jackson, III, Allen & Gooch, Lafayette, Counsel for Defendant/Appellee the Louisiana Insurance Guaranty Association.
Daniel J. Caruso, James A. Burton, M. Davis Ready, Jeffrey J. Thomas, Simon Peragine Smith & Redfearn, LLP, New Orleans, Counsel for Defendant/Appellant Celadon Truck Services, Inc.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge DENNIS R. BAGNERIS Sr., Judge MICHAEL E. KIRBY).
PATRICIA RIVET MURRAY, Judge.
This appeal is taken by the third party plaintiff, Celadon Trucking Services, Inc. ("CTSI"). CTSI appeals from the trial court's judgment dismissing the third party defendant, Louisiana Insurance Guaranty Association ("LIGA"), from this suit and awarding it defense costs, including attorney's fees. The principal issue presented is whether the trial court erred in its interpretation of La. R.S. 22:1379(3)(f), the net worth exclusion to the definition of a LIGA-covered claim. For the reasons that *1001 follow, we amend the judgment to delete the award of defense costs and, as amended, affirm.

FACTUAL, PROCEDURAL, AND STATUTORY BACKGROUND
The underlying facts in this case are undisputed. This case arises out of a rear-end collision that occurred in Orleans Parish on April 24, 1997. The accident occurred when the vehicle Sheila Hopkins was driving was rear ended by the truck James Howard was driving. At the time of the accident, Mr. Howard was acting in the course and scope of his employment with CTSI, and CTSI was insured under a commercial policy issued by Reliance National Insurance Company ("Reliance"). On October 9, 1997, Ms. Hopkins and her husband commenced this suit against Mr. Howard, CTSI, and Reliance.
In May 2001, the Commonwealth Court of Pennsylvania placed Reliance into rehabilitation. In October 2001, the Pennsylvania court declared Reliance insolvent and ordered it liquidated. Since Reliance's insured's (CTSI's) domicile was Indiana, claim files relating to pending claims against CTSI, including the Hopkins's claim, were tendered to the Indiana Insurance Guaranty Association ("IIGA"). Since Ms. Hopkins's domicile was Louisiana, IIGA forwarded this case to LIGA.[1] By letter dated July 31, 2003, LIGA notified IIGA that it was refusing to handle the claim, stating that "Louisiana has a Net Worth provision of $25 million, and the insured [(CTSI)] and affiliates exceed this figure. The Louisiana Guaranty Fund [(LIGA)] will not be involved in this case."[2] On August 14, 2003, the trial court issued an order dismissing Reliance from this suit and reserving the Hopkins's rights to pursue other parties to this litigation.
On July 15, 2004, CTSI and Mr. Howard filed a third party demand against LIGA, seeking indemnification and defense of this suit. LIGA answered the third party demand asserting as an affirmative defense the net worth exclusion, La. R.S. 22:1379(3)(f), and citing the recoupment provision, 22:1382(D). LIGA also filed a motion for summary judgment contending that there were no material issues of fact and that based on La. R.S. 22:1379(3)(f) it was entitled to judgment as a matter of law.
To understand the trial court's reasons for granting summary judgment in LIGA's favor, it is necessary to first provide a brief statutory background.
In 1969, the National Association of Insurance Commissioners ("NAIC") adopted a Model Act in an attempt to prevent insurance company failures from undermining the public's confidence in the insurance industry. The stated purpose of the Model Act was "to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the costs of such protection among insurers." Model Act § 4 (1969). The NAIC recommended that *1002 each state establish an insurance insolvency fund to pay covered claims.
In 1970, the Louisiana Legislature adopted La. R.S. 22:1375-1394 (the "LIGA Law"). Although not expressly stated therein, the LIGA Law was taken almost verbatim from the Model Act, including the statement of purpose quoted above. Backhus v. Transit Casualty Co., 549 So.2d 283, 289 (La.1989). LIGA fulfills its purpose through the mechanism of paying covered claims, which are defined by statute. Despite the broadly stated purpose, "the Legislature has not deemed LIGA to be an all-purpose guarantor." Carey J. Guglielmo, The ABC's of LIGA, 53 La. L.Rev. 1759, 1763 (1993). Indeed, "the limitations of liability specified in the LIGA Law  the LIGA deductible, the liability cap, etc.  more often than not result in somebody losing money." Id. at 1762.
In 1999, the Louisiana Legislature added a new limitation on LIGA's liability: a net worth exclusion. Act No. 475 of 1999 enacted the following net worth exclusion to the definition of a "covered claim":
"Covered claim" shall not include any claim by any insured whose net worth exceeds twenty-five million dollars on December thirty-first of the year immediately preceding the date of the determination of the insolvency of the insurer. However, an insured's net worth on such date shall be deemed to include the aggregate net worth of the insured and all of its subsidiaries and affiliates as calculated on a consolidated basis. An insured for the purposes of this provision shall not include any state or local governmental agency or subdivision thereof.
La. R.S. 22:1379(3)(f)(as enacted by Act No. 475 of 1999)(emphasis supplied).[3] We refer to an insured whose net worth exceeds the statutory cap as a "high net worth" insured.
Act No. 475 of 1999 was a comprehensive package that included not only the above net worth exclusion, but also two other provisions; to-wit: (i) a recoupment provision that allows LIGA to recover for claims it paid on behalf of a high net worth insured, La. R.S. 22:1382(D); and (ii) an exemption from LIGA assessment for premiums paid by a high net worth insured, La. R.S. 22:1382(A)(3)(f). Act No. 109 of 2004 made parallel changes to all three of the statutes included in the package. The 2004 amendment, among other things, added a definition of the term "affiliate" to La. R.S. 22:1379(3)(f), the net worth exclusion.[4]
*1003 Citing the 2004 amendment, the trial court granted LIGA's motion for summary judgment. The trial court in its written reasons for judgment reasoned as follows:
1. Act 109 of the 2004 Regular Legislative Session, defining the term "affiliate" in Louisiana Revised Statutes 22:1379(3)(f) and 22:1382(A)(3)(f), is interpretive and therefore is to be given retroactive application.
2. Act 109 of the 2004 Regular Legislative Session defines "affiliate" to include any person or entity who controls or is controlled by or is under common control with the insured, whether through the ownership of voting securities or otherwise. This definition includes a parent company of the insured.
3. Accordingly, Celadon Group, Inc., the parent company of Celadon Trucking Services, Inc., is an "affiliate" of Celadon Trucking Services, Inc.
4. Therefore, the net worth on December 31, 2001[5] of Celadon Group, Inc., along with all of the other affiliates of Celadon Trucking Services, Inc., calculated on a consolidated basis, is the appropriate standard to determine whether the aggregate net worth of Celadon [Trucking Services, Inc.] and its affiliates exceeds $25,000,000.00.
5. LIGA has proved, to the satisfaction of the Court, that the net worth of Celadon Group, Inc., alone, far exceeds the $25,000,000 net worth exception to the definition of a "covered claim" as to LIGA, contained in Louisiana Revised Statute 22:1379(3)(f).
Citing La. R.S. 22:1382(D), as amended in 2004, the trial court further found that CTSI is "obligated to reimburse LIGA for the reasonable costs incurred in the defense of this claim, including attorney['s] fees, administrative costs, court costs, and all costs associated with bringing the instant Motion."
CTSI has appealed the judgment, arguing that the trial court erred in retroactively applying the 2004 amendments to the LIGA statutes.

STANDARD OF REVIEW
"Favored in Louisiana, the summary judgment procedure `is designed to secure the just, speedy, and inexpensive determination of every action' and shall be construed to accomplish these ends." King v. Parish Nat'l Bank, XXXX-XXXX, p. 7 (La.10/19/04), 885 So.2d 540, 545 (quoting La. C.C.P. art. 966(A)(2)). An appellate court reviews a trial court's decision granting summary judgment de novo using the same standard applied by the trial court in deciding the motion for summary judgment. Schmidt v. Chevez, 2000-2456, p. 4 (La.App. 4 Cir. 1/10/01), 778 So.2d 668, 670. According to this standard, a summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, *1004 and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B); Schmidt, 2000-2456 at p. 3, 778 So.2d at 670. This case does not turn on whether there is a matter of material fact; rather, this case turns on the meaning given to the wording of a statute. See Louisiana Horsemen's Benevolent and Prot. Ass'n 1993, Inc. v. Fair Grounds Corp., XXXX-XXXX, p. 3 (La.4/9/03), 845 So.2d 1039, 1041.

DISCUSSION
As to the award for reimbursement of costs, including attorney's fees, court and associated costs, we agree with CTSI that the 2004 amendment authorizing LIGA's recovery of defense costs, including attorney's fees, was a substantive amendment that cannot be given retroactive effect. We find the reasoning of the Fifth Circuit in Louisiana Insurance Guaranty Ass'n v. Johnson Controls, Inc., 2005-27 (La.App. 5 Cir. 5/31/05), 905 So.2d 444, to be compelling, and, therefore, amend the judgment to delete the award of defense costs.
CTSI argues that the trial court likewise erred in retroactively applying the 2004 amendment adding a definition of the term "affiliate." We find it unnecessary to decide that issue. Rather, we find, as LIGA contends, that regardless of whether the amendment applies the result would be the same. Indeed, we note that LIGA made the determination that the net worth exclusion applies so as to bar the Hopkins's claim from LIGA coverage in 2003 before the amendment. Thus, the narrow issue before us is the legal issue of whether under the original statute as enacted in 1999 the undefined term "affiliate" included a parent company.[6]
The legal issue presented is whether under the 1999 version of La. R.S. 22:1379(3)(f), the undefined term "affiliate" included a parent company. CTSI argues that the term "affiliate" should be narrowly construed to include only companies at a lower level  subsidiaries  or at the same level  sibling companies. LIGA counters that the term should be broadly construed to include all companies affiliated with the insured including parent companies.
As CTSI acknowledges, the issue of what constitutes an "affiliate" under the original statute is a function of the Legislature's intent, and the rules of statutory construction are determinative in establishing the scope of the undefined term "affiliate."
The Civil Code contains five provisions that directly relate to statutory interpretation:
 "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. C.C. art. 9. This is the plain meaning rule.[7]

*1005  "When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." La. C.C. art. 10.
 "The words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter." La. C.C. art. 11.[8]
 "When the words of a law are ambiguous, their meaning must be sought by examining [(a)] the context in which they occur and [(b)] the text of the law as a whole." La. C.C. art. 12.
 "Laws on the same subject matter must be interpreted in reference to each other." La. C.C. art. 13. This is the in pari materia rule of statutory construction.
The starting point in interpreting any statute is the language of the statute itself. Touchard v. Williams, 617 So.2d 885, 888 (La.1993). The statutory phrase at issue, which was not changed by the 2004 amendment, is the provision in La. R.S. 22:1379(3)(f) that "an insured's net worth on such date shall be deemed to include the aggregate net worth of the insured and all of its subsidiaries and affiliates as calculated on a consolidated basis." La. R.S. 22:1379(3)(f). The dispute is over the meaning of the undefined term "affiliate." In determining the common and approved usage of an undefined word, "[d]ictionaries are a valuable source." Gregor v. Argenot Great Central Ins. Co., XXXX-XXXX, p. 7 (La.5/20/03), 851 So.2d 959, 964. Dictionaries "provide a useful starting point for determining what statutory terms mean, at least in the abstract, by suggesting what the legislature could have meant by using particular terms." 2A Norman Singer, Statutes and Statutory Construction § 47:28 (6th ed.2000).
Black's Law Dictionary defines an affiliate as follows:
1. A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation....
2. Securities. One who controls, is controlled by, or is under common control with an issuer of a security. SEC Rule 10b-18(a)(1).
Bryan Garner, Black's Law Dictionary (8th ed.2004).[9] Another legal dictionary defines an affiliate as follows:
A person or company with an inside business connection to another company. Under bankruptcy, securities, and other laws, if one company owns more than a certain amount of another company's voting stock, or if the companies are under common control, they are affiliates.
Daniel Oran, Oran's Dictionary of the Law (1983).[10]
*1006 Although other dictionary definitions arguably lend support to CTSI's narrow reading of the term affiliate,[11] the legal dictionary definitions quoted above support LIGA's broad reading.[12] When a word is susceptible to different meanings, we are required to interpret it in conformity with the purpose of the law. La. C.C. art. 10.
Explaining the Louisiana Legislature's purpose for enacting the net worth exclusion, one court recently noted:
Over the years, a large amount of LIGA's funds were expended on behalf of large commercial insureds. Net worth exclusions were enacted in an effort to redirect available resources away from entities with high net worth in favor of individuals who would not otherwise be covered and for whom it was intended. Thus, the legislature determined that insureds with a net worth over 25 million dollars were in a better position to bear the loss of an insolvent insurer worth less money for whom LIGA funds would be available.
Johnson Controls, Inc., 2005-27 at pp. 9-10, 905 So.2d at 450. Thus, "[t]he theory behind the exclusion is that because insurance guaranty fund resources are limited, parties with assets over a certain amount should not be able to make claims against the fund because `they are in a position to better bear the inevitable loss themselves.'" 5 Law and Prac. of Ins. Coverage Litig. § 58:19 (2005). Simply stated, "the net worth provision results in leaving more resources available for those entities less able to absorb an uncovered loss." Delaware Insurance Guar. Ass'n v. Christiana Care Health Services, Inc., 892 A.2d 1073 (Del.Supr.2006).[13] Indeed, a net worth exclusion has been noted to be similar to the general cap on the fund's liability in that both serve to preserve the limited resources of the fund. Goodyear Tire & Rubber Co. v. Dynamic Air, Inc., 702 N.W.2d 237, 243 (Minn.2005).
Although construing the term affiliate broadly would be consistent with the purpose of the net worth provision of preserving the limited resources of the fund, the purpose does not necessarily resolve the *1007 issue presented here. When the purpose of the statute does not resolve the issue of the meaning of a word in a particular statute, "resort to related statutes is necessary." 20 P. Raymond Lamonica and Jerry G. Jones, Louisiana Civil Law Treatise: Legislative Law and Procedure, § 7.6 (2004).
CTSI suggests that the related statutes we should resort to in applying this rule of statutory construction are the provisions of the Insurance Code. Because the Legislature expressly included the term parent company in other provisions of the Insurance Code but omitted the term from this provision, CTSI contends that we should construe the term "affiliate" in this provision as having a more precise meaning that excludes parent companies. Contrary to CTSI's suggestion, we find the pertinent related statutes are the net worth exclusions to the definition of covered claim other states have enacted and the jurisprudence construing those statutes.[14]
In Harold Ives Trucking Co. v. Pickens, 355 Ark. 407, 139 S.W.3d 471 (2003), which LIGA cites, the Arkansas Supreme Court certified the res nova issue of whether the undefined term affiliate in the net worth exclusion to the Arkansas Guaranty Act, Ark.Code Ann. § 23-90-103(2)(B),[15] included a parent company of a wholly owned subsidiary. In answering this question in the affirmative, the court relied upon three factors: (i) the Arkansas jurisprudential rule that "common sense is a key element in defining statutory construction"; (ii) the dictionary definition of the term affiliate in Black's Law Dictionary (7th ed.1999) as a "corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation"; and (iii) the definition of affiliate codified in another state's net worth statute as "a person who directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the specified person on December 31 of the year next preceding the date the insolvent company became an insolvent company." 73 Ill. Comp. Stat. Ann. 5/534.7. From those accepted definitions, the court gleaned that control is the fundamental standard. Pickens, 355 Ark. at 411, 139 S.W.3d at 474. Applying the control standard coupled with common sense, the court concluded that a parent company of a wholly owned subsidiary is an affiliate. We agree.
CTSI contends that Pickens is distinguishable on the basis that the Arkansas statute refers only to affiliates; whereas, the Louisiana statute refers to both subsidiaries and affiliates. Contrary to CTSI's contention, we find the inclusion of the term subsidiary in the Louisiana statute at issue is a distinction without a difference. As the court in Pickens points out, the Model Act provision includes a requirement that for the purpose of determining the applicability of the exclusion the insured's net worth shall be deemed to include that of all its subsidiaries as calculated *1008 on a consolidated basis at the end of the year preceding the insurer's insolvency. Pickens, 355 Ark. at 413, 139 S.W.3d at 475. In contrast, several other states, including Arkansas and Illinois, have adopted broader provisions that deem the insured's net worth to include that of any of its affiliates. By including both terms  subsidiary and affiliate  in the net worth exclusion, we find the Louisiana Legislature intended to create at least as broad of an exception as that in the other states in which only the term affiliate is used. As one court recently noted, "by referring to `the aggregate net worth of the insured and all of its affiliates as calculated on a consolidated basis', the legislature appears to be mandating the consideration of a broad, rather than a narrow, range of assets in determining an entity's net worth." Community Unit School District 200 v. Illinois Insurance Guaranty Fund, 358 Ill.App.3d 1056, 295 Ill.Dec. 321, 832 N.E.2d 472, 477 (2d Dist.2005). Likewise, we find the term affiliate was intended to have a broad meaning, which includes a parent company.
Our finding that the term affiliate was intended to have a broad meaning is supported by a consideration of the term in the context of the entire statutory provision. See La. C.C. art. 12 (providing that the meaning of ambiguous words must be sought by examining them in the statutory context in which they appear). The statute utilizes the accounting concept of consolidated net worth. See La. C.C. art. 11 (providing that "technical terms must be given their technical meaning when the law involves a technical matter.") Consolidation refers to the financial reporting of parent and subsidiary corporations as a single economic unit, "regardless of legal and geographic boundaries." D. Edward Martin, CPA, Attorney's Handbook of Accounting, Auditing and Financial Reporting, § 2.03[1](2004).[16] Because the net worth exclusion expressly refers to subsidiaries and because consolidation refers to aggregating the financial statements of parent and subsidiaries, CTSI's argument that the term affiliate includes only subsidiaries and sibling companies would make the term affiliate in this context redundant. It would thus violate the principle of statutory construction that the Legislature is presumed to have intended every word and phrase included in a statute to have some meaning and that none was inserted by accident. Elevating Boats, Inc. v. St. Bernard Parish, XXXX-XXXX, p. 18 (La.9/5/01), 795 So.2d 1153, 1166.
In support of its position that the trial court erred in granting summary judgment, CTSI also cites the single business enterprise doctrine. The single enterprise doctrine is an equitable doctrine, similar to the piercing of the corporate veil, under which the courts may disregard a company's separate corporate existence and require the aggregation of its assets with an affiliated company to satisfy liabilities or claims of creditors.[17] The statutory *1009 provision at issue does not disregard the separate corporate existence of affiliated companies. Rather, it employs the accounting concept of consolidated net worth, discussed above, to determine the insured's eligibility for LIGA coverage. As noted, consolidation deems a parent company and its subsidiaries to be a single economic unit for accounting purposes. CTSI's reliance on the single business enterprise theory is thus misplaced.
Finally, CTSI contends that the provisions of the LIGA Law, La. R.S. 22:1377 and 1378, require that the statute be construed liberally in support of coverage. The Louisiana Supreme Court has rejected a similar argument, reasoning that "[a] liberal interpretation of the [Louisiana] Insurance Guaranty Law, even though authorized by the Law itself, cannot overcome the specific statutory exemptions from coverage under that law." Backhus, 549 So.2d at 291. In Pickens, supra, the Arkansas Supreme Court likewise rejected a similar argument that it should narrowly interpret the term affiliate to safeguard the rights of insured and third-party claimants as required by the Arkansas Guaranty Act. As a commentator has observed, the guaranty fund acts by including provisions such as net worth exclusions effectively have "abandoned the mandate in the model acts and in the various [Insurance Guarantee Acts] statutes to interpret the guaranty fund statutes broadly to protect the insured." J. Ernest Hartz, Jr., State Insurance Guaranty Associations, 22-FALL Brief 20, 45 (1992).
In sum, we find the term affiliate is a broad one that includes a parent company. For this reason, we affirm the trial court's decision granting summary judgment in LIGA's favor.

DECREE
For the forgoing reasons, the trial court's judgment is amended to delete the award to LIGA of defense costs, including attorney's fees. In all other respects, the trial court's judgment is affirmed.
JUDGMENT AMENDED AND AS AMENDED AFFIRMED.
NOTES
[1] In October 2002, the parties filed a joint motion for a continuance of the trial on the basis that "the Indiana Guaranty Association [(IIGA)] may not have coverage for this incident but the Louisiana Guaranty Association [(LIGA)] may have coverage, and both parties desire a continuance to allow time to determine insurance coverage if any."
[2] As discussed below, LIGA made the determination that the net worth exclusion applied to bar coverage in this case in 2003 before the Legislature amended the statute to define the term affiliate.
[3] Although the net worth exclusion was not enacted until 1999, which is after the date of the underlying accident at issue in this case, it is well settled that the applicable law governing claims against LIGA is the law in effect on the date of the insurer's insolvency. See Harvey v. Traylor, 96-1321, p. 21-22 (La.App. 4 Cir. 2/5/97), 688 So.2d 1324, 1336-37 (citing Prejean v. Dixie Lloyds Ins. Co., 94-2979 (La.5/22/95), 655 So.2d 303, opinion modified on rehearing, 94-2979 (La.9/15/95), 660 So.2d 836). The reason for this is that the claim against LIGA does not accrue until the insurer is declared insolvent. Id.
[4] As amended, Section 22:1379(3)(f) now provides:

"Covered claim" shall not include any claim asserted for coverage under a policy held by any insured whose net worth exceeds twenty-five million dollars on December thirty-first of the year immediately preceding the date of the determination of the insolvency of the insurer. However, an insured's net worth on such date shall be deemed to include the aggregate net worth of the insured and all of its subsidiaries and affiliates as calculated on a consolidated basis. An "affiliate" of the insured includes any person or entity who directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the insured. "Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of the controlled person or entity, whether through the ownership of voting securities, by contract, or otherwise. The consolidated net worth of the insured and all of its subsidiaries and affiliates shall be calculated on the basis of their fair market values. The failure or refusal of a person or entity to return a net worth affidavit to the association after two requests therefor shall create a rebuttable presumption that the noncompliant person or entity had a net worth in excess of twenty-five million dollars on December thirty-first of the year immediately preceding the date of the determination of the insolvency of the insurer. An insured for the purposes of this provision shall not include any state or local governmental agency or subdivision thereof.
La. R.S. 22:1379(3)(f) (as amended by Act No. 109 of 2004)(emphasis supplied).
[5] Although the trial court refers to the date as December 31, 2001, it is undisputed that the pertinent date for determining whether the net worth exception applies is December 31, 2000. This is because Reliance was declared insolvent in October 2001.
[6] The parties do not dispute the summary judgment evidence establishing that CTSI's net worth on December 31, 2000 was less than the twenty-five million statutory cap and that CTSI had no subsidiaries. Nor do the parties dispute that CG's consolidated net worth on that date was more than the statutory cap and that CTSI on that date was the wholly owned subsidiary of CG. The latter point was acknowledged by CTSI's counsel at oral argument before this court. Regardless, we note that the financial documents LIGA introduced in support of its motion for summary judgment reflect that CG is a major conglomerate with numerous subsidiaries, including CTSI. The documents also reflect that CTSI, as a subsidiary of CT, was included in CT's consolidated financial statements for the pertinent period.
[7] The same concept is expressed in La. R.S. 1:4, which provides that "[w]hen the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit." La. R.S. 1:4.
[8] The same concept is expressed in La. R.S. 1:3, which provides that "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." La. R.S. 1:3.
[9] See also McCall v. Cameron Offshore Boats, Inc., 93-787 (La.App. 3 Cir. 3/9/94), 635 So.2d 263 (citing Black's Law Dictionary (6th ed.1991), to define "affiliate company" as used in a compromise agreement to mean one that is "effectively controlled by another company. A branch, division, or subsidiary.... Corporations which are related as parent and subsidiary, characterized by identity of ownership of capital stock.")
[10] See 17 C.F.R. § 230.405 (defining an affiliate under the securities law as "a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified" and a parent as "an affiliate controlling such person directly, or indirectly through one or more intermediaries.")
[11] An affiliate is also defined as "a branch or unit of a larger organization" or "a company effectively controlled by another or associated with others under common ownership or control" such as a subsidiary. Webster's Third New International Dictionary (1971). Another dictionary defines the term as "[t]o adopt as a subordinate associate" or "[t]o associate (with)." The American Heritage Dictionary of the English Language (1978). Still another dictionary defines the adjective "affiliated" as "closely associated with another typically in a dependent or subordinate position." Mirriam-Webster's Collegiate Dictionary (10th ed.1993).
[12] See Braun v. Insurance Co. of North America, 488 F.2d 1066, 1067-68 (5th Cir.1974)(rejecting restrictive downstream definition of term affiliate as used in an insurance policy and finding the term refers to the legal concept of "the present day corporation most spectacularly represented by the conglomerate, in which connections between companies may be vertical, diagonal or horizontal and sometimes all the way around with occasional mixtures of any one or all of the four"); see also Flintkote Co. v. General Acc. Assur. Co., 410 F.Supp.2d 875 (N.D.Cal.2006) (construing the term affiliate in an insurance policy to include a parent company and citing in support Braun, supra, and Harold Ives Trucking Co. v. Pickens, 355 Ark. 407, 139 S.W.3d 471 (2003)).
[13] A corollary reason for the exclusion is the belief "that an insured with that much net worth ought to buy insurance intelligently enough so that it would not be insured by an unsound insurer."' Pickens, 355 Ark. at 413-14, 139 S.W.3d at 476.
[14] See 20 P. Raymond Lamonica and Jerry G. Jones, Louisiana Civil Law Treatise: Legislative Law and Procedure, § 7.7 (2004)(noting that under La. C.C. art. 13, "[r]eview of other statutes may include federal laws and the laws of another state, and case law construing them."); see also J. Ernest Hartz, Jr., State Insurance Guaranty Associations, 22-FALL Brief 20, 22 (1992)(noting that although "the state laws are not uniform in all respects, the statutes are for the most part sufficiently alike that commonly accepted principles of interpretation and application can and should be accepted by all.")
[15] The Arkansas statute provides in pertinent part that "an insured or third party claimant's net worth on such date shall be deemed to include the aggregate net worth of the insured and all of its affiliates as calculated on a consolidated basis." Ark.Code Ann. § 23-90-103(2)(B).
[16] Consolidation is defined as "[t]he process of adjusting and combining information from the individual financial statements of a parent undertaking and its subsidiaries to prepare consolidated financial statements. These statements should present financial information for the group as a single economic entity." R. Hussey, Oxford Dictionary of Accounting (1999). "Virtually all major U.S. corporations have subsidiary relationships and, accordingly, prepare consolidated financial statements." D. Edward Martin, CPA, Attorney's Handbook of Accounting, Auditing and Financial Reporting, § 2.03[1](2004). Although a parent corporation and its subsidiaries are "separate legal entities and may be widely disparate in geography and the nature of their activities," consolidated financial statements are a "basic financial reporting technique." Id.
[17] See Green v. Champion Ins. Co., 577 So.2d 249 (La.App. 1st Cir.1991); see also Dishon v. Ponthie, 2005-659 (La.App. 3 Cir. 12/30/05), 918 So.2d 1132.